## DREXEL et al. v. LOOMIS et al.

Circuit Court of Appeals, Eighth Circuit.
November 4, 1929.

No. 8309.

Alfred G. Ellick, of Omaha, Neb. (Francis A. Brogan and Anan Raymond, both of Omaha, Neb., on the brief), for appellants.

F. H. Gaines, of Omaha, Neb. (E. G. McGilton, R. A. Van Orsdel, and F. S. Gaines, all of Omaha, Neb., on the brief), for appellee Loomis.

Arthur Mullen, Halleck F. Rose, and Edgar M. Morsman, Jr., all of Omaha, Neb., and Woods, Woods & Aitken, of Lincoln, Neb., for appellees Frank H. Woods and others.

Before KENYON and VAN VALKENBURGH, Circuit Judges, and MARTINEAU, District Judge.

VAN VALKENBURGH, Circuit Judge. September 30, 1922, M. E. Smith & Co., Inc., a Nebraska corporation, was doing a wholesale dry goods business in Omaha. It had been so engaged for more than 50 years. Its capital stock outstanding consisted of the following:

First preferred .............................. $ 887,900 00
Second preferred ........................... 976,600 00
Common ................................... 1,500 000 00

As found by the referee in bankruptcy, there were on that date in existence the following allied corporations: The Burgess-Nash Company, engaged in the retail dry goods business in Omaha; the Burgess-Nash Building Company, owner of one of the buildings occupied in business by the Burgess-Nash Company; the M. E. Smith Building Company, owner of buildings occupied by M. E. Smith & Co., Inc., in its business. Ward M. Burgess was president of M. E. Smith & Co., Inc., hereinafter referred to as Smith & Co. He, Louis C. Nash, and A. C. Smith owned all the common stock of this company; and, for some time prior to the date in question, the business of the company had been managed by said Burgess, by Louis C. Nash, representing what are called the Nash interests, and by Arthur C. Smith representing the Smith interests consisting of descendants of the original founders. The Nash interests held $375,000 of the second preferred stock. The Burgess-Nash Company was a reorganization of a retail department store in Omaha acquired by Ward M. Burgess and Louis C. Nash some years before. It appears from the testimony that the business of this store had not been successful.

The Smith Building Company owned, as its sole asset, one of the buildings occupied by Smith & Co.; all its common stock was owned by the Burgess-Nash Company; its preferred stock, by the general investing public. The Nash Building Company owned, as its sole asset, one of the buildings ocupied by the Burgess-Nash Company. Its entire common stock was held by the latter company; its preferred stock, by the Nash interests. From these facts, the very close relationship existing between these allied corporations is apparent. All were really controlled by Burgess and the Nash interests (the latter, with the possible exception of Louis C. Nash, being people of large wealth), and all were operated under one management. As was to be expected, the financial relationships existing were correspondingly interlaced. We quote from findings 15 and 16 of the referee in bankruptcy:

"15. The entire common stock of Smith & Company 15,000 shares, par value $1,500,-000.00, was owned by Louis C. Nash, Ward M. Burgess and A. C. Smith. This common stock of Smith & Company has been pledged to secure indebtedness as follows:

(a) A. C. Smith held note of Nash and Burgess for ......................... $ 424,790 00
(b) C. W. Russell held note of Nash and Burgess for .......................... 33,000 00
(c) Floyd Smith held note of Nash and Burgess for .......................... 64,600 00
(d) W. D. Smith held note of Nash and Burgess for ....................... 84,271 00
(The foregoing notes were secured by pledge of common stock of Smith & Company).
(e) C. B. Nash Co., held note of Nash and Burgess for...................... 1,000,000 00
(This note was secured by 10,000 shares of the common stock of M. E. Smith & Co.)
(f) Chemical National Bank held note of Nash, Burgess and Smith for.... 100,000 00
(g) Hanover National Bank held note of Nash, Burgess and Smith for ...... 100,000 00
(The last two notes were secured by 4,000 shares of common stock of M. E. Smith & Co.)

Total ................................. $1,806,661 00

"16. In addition to the notes set out in the last preceding finding, there were obligations to Smith & Company as follows:

Smith & Company held note of Nash, Burgess and Smith for.................. $200,000 00
Smith & Company held note of Nash and Burgess for ............................. 30,000 00
Smith & Company held claim against Burgess and others for about........... 300,000 00"

It is conceded by both parties that Smith & Co. was in financial difficulty on September 30, 1922. Appellants make this admission in the mild form that "in the summer of 1922 it became desirable to have some additional capital put into the business of Smith Co. and Nash Co." It appears that on two occasions,

shortly prior to 1922, Smith & Co. had required financial assistance, which had been furnished by the Nash interests. Counsel for appellees flatly contend that "in the summer of 1922 M. E. Smith & Co. was wholly insolvent." The referee in bankruptcy so finds, the court confirmed his conclusion, and we think the record supports it. It is further agreed that the Nash and Smith interests refused again to supply the capital needed. Counsel for appellants in their brief concede that the record discloses that in the summer of 1922 additional capital was needed, and that the Nash and Smith interests were unwilling to participate in supplying this additional capital. Counsel for appellees put it thus:

"With M. E. Smith & Co. once again insolvent, Burgess endeavored to persuade the Nash interests to once more save the company from bankruptcy, but he met with an absolute refusal."

Under these circumstances, as both sides agree, Burgess conferred with Woods Bros. and others for the purpose of interesting them in the matter. On Sunday, October 1, 1922, appellee Mark Woods came to Omaha on his way to a hunting lodge owned by him and his brothers in Northwestern Nebraska. He visited the home of Ward Burgess, and there met Walter C. Teagle, president of the Standard Oil Company of New Jersey, and one Samuel A. Megeath, a resident of New York City, and an intimate friend of Burgess. Previous to this, in September, Burgess had called upon Mark W. Woods at his home in Lincoln, stated that misunderstandings had arisen between Burgess and Louis C. Nash over the additional money required to put the business of Smith & Co. in shape, and asked if Woods Bros. would consider such a proposition. Woods at first regarded the proposed matter unfavorably, and suggested that Omaha people were the logical ones to interest in the project. At Omaha, on October 1st, the subject was discussed anew. Teagle, Megeath, and Burgess accompanied Mark W. Woods to his hunting lodge, where they joined George J. Woods. Further discussion occurred with respect to the additional financing of Smith & Co., and a favorable, though tentative, conclusion was reached. Returning from the hunting trip, the persons above mentioned went to Chicago to confer with Mr. Otis, president of the Central Trust Company of that city. There they were joined by Frank H. Woods, a brother of Mark and George, a stockholder in Woods Bros. Corporation, but not a partner in Woods Bros., and Woods Bros. Investment Company. The matter discussed was the financing of Smith & Co. by putting into that company $500,000 in cash in return for the entire 15,000 shares of the common stock and the securing of a fifteen-year loan of $1,750,-000 from the Central Trust Company. Mark W. Woods agreed to furnish three-sevenths of the cash sum of $500,000 provided Burgess would contribute two-sevenths and Teagle and Megeath each one-seventh. This was agreed to, and the money was subsequently furnished. It was afterward found, however, that Teagle really contributed but one-fourteenth instead of one-seventh of this amount.

Because of the interlaced financial relationships existing between the allied corporations, it was necessary to the contemplated refinancing of Smith & Co. that what has been described as the Nash interests should be acquired. Negotiations to this end were carried on between Burgess and one L. F. Crofoot representing said interests. Accordingly, on October 16, 1922, the latter made a written proposal. This is best set out in the language of the referee's findings:

"17. The written proposal of October 16, 1922 provided for the deposit with the Trust Company of the $1,000,000.00 note signed by W. M. Burgess and L. C. Nash, which is referred to in Finding 15, and also for the deposit with the Trust Company of the stock referred to in Finding 14, viz:

Smith Building Co., Common Stock...... 5,000 shares
Burgess-Nash Company, Common Stock 3,072 shares
Smith & Company, Second Preferred Stock ................................. 3,750 shares

"18. Under said proposal said Burgess and associates were to deposit with the Omaha Trust Company, in escrow, within fifteen days from the date of said proposal, $500,-000.00, from which payments were to be made as follows:

(a) The amount due (with accrued interest) on note held by Smith & Company and signed by W. M. Burgess, A. C. Smith and Louis C Nash, which is referred to in Finding 16, for...... $200,000 00
(b) The two notes of Nash, Burgess and Smith mentioned in subdivisions (f) and (g) of Finding 15, for............. 200,000 00
(c) The amount due (with accrued interest) on note held by Smith & Company and signed by W. M. Burgess and L. C. Nash, which is referred to in Finding 16, for..................... 30,000 00

Total .................................. $430,000 00

"Any unused portion of said $500,000.00 was to be paid into the treasury of Smith & Company.

"Upon payment of the note referred to in subdivision (a) of this finding, said note was to be canceled and delivered to the Trust Company, to be destroyed on consummation of the plan outlined in said proposal of October 16, 1922.

"Upon payment of the two notes referred to in subdivision (b) of this finding, said notes were to be canceled and surrendered by said banks, and returned to said Trust Company to be destroyed, and the collateral security held for the payment of said notes, including 4,000 shares of common stock of Smith & Company, was to be released and turned over to said Trust Company.

"Upon payment of the note referred to in subdivision (c) of this finding, said note was to be canceled and delivered to the Trust Company.

"19. Under said written proposal of October 16, 1922.

"(a) The note for $1,000,000.00 signed by Nash and Burgess and held by the C. B. Nash Company, mentioned in subdivision (e) of Finding 15, was to be canceled and destroyed, and all claims held by said Nash Company on the common stock of Smith & Company, pledged for the payment of said note, were to be released, upon consummation of the plan outlined in said proposal.

"(b) On consummation of the plan outlined in said proposal the stock mentioned in Finding 17 was to be delivered to Smith & Company.

"(c) W. M. Burgess, within ten days, was to execute and deliver to the Trust Company to be held in escrow, his ten year 6 per cent. promissory note, payable to the order of The C. B. Nash Company for $300,000.00, signed by his wife, Margaret B. Burgess, with clause charging her separate property, etc., said note to be secured by assignment of a $500,000.00 policy of insurance on his life subject only to a loan of $100,000.00 made by the issuing company to said Burgess, which note together with assignment of said insurance policy, was on consummation of the plan outlined in said proposal, to be delivered to The C. B. Nash Company.

"(d) Payment was to be made by the Central Trust Company of Illinois to the Omaha Trust Company, for the account of Smith & Company, of $1,750,000.00, within sixty days, being the proceeds of the proposed fifteen-year, 6 per cent., note issue to be made by Smith & Company and sold to said Central Trust Company.

"(e) The notes signed by Nash and Burgess mentioned in subdivisions (a), (b), (c) and (d) of Finding 15, totaling $606,661.00, were to be canceled and delivered to the Omaha Trust Company and the shares of common stock of Smith & Company which had been pledged to secure payment of said notes, released.

"(f) On consummation of the plan outlined in said proposal, The C. B. Nash Company agreed to reduce the present rental on the Nash-Smith building (so-called) by the amount of $70,000.00 per annum.

"(g) On consummation of the plan outlined in said proposal, delivery was to be made to W. M. Burgess and associates in accordance with their instructions, of 15,000 shares of the common stock of Smith & Company."

Meantime the Central Trust Company, having completed its investigations of the affairs of Smith & Co., demanded the following modifications of the terms of the proposal of October 16, 1922:

"(a) The loan to be made by the Central Trust Company should be $1,500,000.00 instead of $1,750,000.00.

"(b) $500,000.00 more money should be put into the business of Smith & Company.

"(c) 26,000 additional shares of common stock, of Smith & Company, par value $2,600,000.00, should be issued."

The modification made was dated November 9, 1922, and was as follows:

"(a) On or before December 1, 1922, payment was to be made to the Omaha Trust Company for account of Smith & Company, by said Central Trust Company of $1,350,000.00, being the proceeds of a proposed ten-year 6½ per cent note issue to be made by Smith & Company, and sold to said Central Trust Company.

"(b) On or before December 1, 1922, W. M. Burgess and Associates were to pay or cause to be paid to the Omaha Trust Company for the account of Smith & Company, an additional sum of $500,000.00, (less costs of financing, which shall not exceed $50,000.00), to be covered into the Treasury of Smith & Company, by the Trust Company, and to constitute a voluntary contribution to the common capital stock of Smith & Company, and to be thereafter retained and treated as such."

When Burgess informed Mark W. Woods of his requirement of the trust company, that an additional $500,000 should be contributed to Smith & Co. as a condition precedent to the loan, Woods declined to advance any more money. Burgess then agreed to raise this sum, if permitted to use the 15,000 shares of the Smith & Co. common stock for that purpose. Accordingly, the M. E. Smith Securities Company was organized as a holding company under the laws of Delaware. One of the purposes of its organization was to raise the $500,000 in question. The stock in the Securities Company was owned by Ward M. Burgess, American Stocks & Bonds, Limited, of Toronto, Canada, Mark W. Woods,

Frank H. Woods, George J. Woods and Samuel A. Megeath.

November 3, 1922, a hearing was held before the bureau of securities of the state of Nebraska upon the application of Smith & Co. for authority to issue 26,000 additional shares of the common capital stock of Smith & Co. of the par value of $2,600,000 and also to issue $1,500,000 of 6½ per cent. collateral gold notes. The referee finds that the following proceedings took place at this hearing:

"31. Burgess testified at this meeting that he had bought from the Nashes the Smith Building Company stock, and all of the Burgess-Nash Company stock, and had turned the same into Smith & Company for reinvestment, which purchase was a personal matter between him and the Nashes; that afterwards he, Burgess, had gone to the three Woods brothers and S. A. Megeath and Walter C. Teagle, and sold to them the common stock of Smith & Company; that Woods Brothers took ⅗ths, Teagle ⅐th, Megeath ⅐th, and himself, Burgess, ⅖ths; also that this group of men had arranged to and would immediately put into the business $1,000,000.00 in cash, and had negotiated for Smith & Company a ten year loan, through the Central Trust Company, for $1,500,000.00, which was to be used for refunding the current indebtedness of Smith & Company; that the $1,000,000.00 to be put into the business was to be used to reduce the company's current indebtedness, and that the parties mentioned acquired the stock on that basis.

"32. Burgess testified, at said hearing before the Bureau of Securities, that in the year 1921 Smith & Company had lost $2,500,000.00, which was due to depression in the value of merchandise. He also testified, concerning the issuance of said $2,600,000.00 of common stock of Smith & Company, that the individuals mentioned in Finding 31, would take the stock in the proportions mentioned, and that through the issuance of said stock it was expected the company would realize, in actual capital or its equivalent, immediately, $2,800,000.00. The Bureau of Securities granted the application."

November 27, 1922, at a special meeting of the stockholders of Smith & Co., the following things were unanimously authorized:

"(a) Amendment to the Articles of Incorporation providing for the issuance of 26,000 additional shares of common stock.

"(b) The Board of Directors to purchase 5,000 shares of Smith Building Company stock, and 3,072 shares of Burgess-Nash Company stock upon such terms and conditions and for such consideration as they may deem expedient.

"(c) A trust deed to be executed to the Central Trust Company pledging the 5,000 shares of Smith Building Company stock, the 3,072 shares of Burgess-Nash Company stock, and the lease from the Smith Building Company to Smith & Company."

There were present or represented at this meeting all the common stock, 7,542 shares (out of 9,000) first preferred, including those of appellants, and 8,376 shares (out of 10,000) second preferred. The 26,000 shares of common capital stock of Smith & Co. were issued to the Securities Company as the nominee of Ward M. Burgess. The original 15,000 shares were transferred directly to that company. The Securities Company issued its debenture bonds in the sum of $500,000 pledging as security all of said common stock and certain life insurance upon the life of Ward M. Burgess. The Omaha Trust Company, as escrow agent, received and deposited to the credit of Smith & Co. in the Omaha National Bank the following sums:

```
Original  Contribution.....................  $ 500,000 00
Amount raised by Securities Company...    500,000 00
Proceeds of Central Trust Company loan  1,350,000 00
                                        ─────────────
   Total ..................................  $2,350,000 00
```

The business of the reorganized companies proceeded for a period approximately of eighteen months after the reorganization was effected. The referee finds that during the year 1923 Burgess caused weekly statements to be sent to Mark W. Woods, showing a large increase in volume of sales and gross profits; that early in 1924 he suggested to Woods that, because of the greatly increased business of Smith & Co., it would be necessary to have more money in the business; that $500,000 in notes be subscribed by owners of the stock of the Securities Company; and that Smith & Co. should attempt to get another $1,000,000 loan on its ten-year notes. Preparatory to the execution of this plan, Mark W. Woods made a thorough investigation of the affairs of the companies, by which it was disclosed that, instead of making the profits reported, losses aggregating several hundred thousands of dollars had been suffered. Woods further found that Teagle had bought only a one-fourteenth interest instead of one-seventh as represented. Because of his prominence in the business world, great stress had been placed upon Teagle's supposed substantial interest in the enterprise. The referee finds that Woods then first learned that Burgess had taken large sums from the business, and of the intercompany transactions whereby large sums, supposed to have been paid into the treasury of Smith & Co., had been divert-

ed to the payment of the obligations of allied companies and individuals.

Armed with this information, Woods proceeded to Chicago, and, with his brothers, placed the situation before the banks who were the principal creditors of the institutions. At first bankruptcy was threatened, but it appears to have been the desire of all parties interested, among whom were the preferred stockholders, that the business be allowed to continue in the hope of a more favorable issue. The creditors insisted, at least, that Burgess retire from the presidency and management. It was necessary, of course, that some basis for settlement of the intercompany accounts should be reached before any reorganization could be accomplished. The record discloses that, because of the operations of Burgess, of which complaint was made, the books of the various companies showed in the spring of 1924 that M. E. Smith Securities Company owed Smith & Co. $211,956.70; M. E. Smith Securities Company owed Burgess-Nash Company $509,080; and Burgess-Nash Company owed Smith & Co. $884,856.07. A detailed account of the circumstances under which these obligations arose would unnecessarily expand this opinion, already unfortunately extended. Suffice it to say that the proposed reorganization of these companies, which required the putting in of further money, demanded the prior settlement of these intercompany accounts on some basis. No one desired bankruptcy, if it could be avoided, and that was the only alternative. Accordingly, a special meeting of the board of directors of Smith & Co. was held March 25, 1924. The president and directors of Smith & Co. resigned. The vacancies were filled by the election of other directors, with the exception of that of George J. Woods. The referee finds that:

"Mr. Sam Burns, who was chairman of the First Preferred Stockholders' Protective Committee of Smith & Company, furnished the required shares of stock to qualify the new members of the Board taking office, and was himself elected a director to fill the vacancy caused by the resignation of one of said directors. Mr. Burns thereupon came into the meeting and took his place as a member of the Board of Directors, and participated in the further proceedings."

This final reorganization of the directory was effected May 7, 1924. The resignation of Burgess was accepted. Mr. C. J. Farley was elected a director in his place, and was unanimously elected president of Smith & Co. █ The first preferred stockholders must thus be deemed to have been cognizant of, and to have acquiesced in, the proceedings

then and thereafter taking place. For the purpose of making the intercompany settlements above referred to, in connection with which appellees herein proposed to retire and lose what they had put in and expended in the attempt to finance Smith & Co., and to turn back to that company everything over which they and their associates might be conceived to exercise control, directly or indirectly, the Securities Company submitted to Smith & Co. a written proposition embodying a contract between these two companies, which was approved and ratified by the board of directors of Smith & Co. on May 7, 1924. As this contract is one of the chief sources of contention in this litigation, we quote its pertinent features:

"(1) The Securities Company surrenders to Smith & Company $2,600,000.00 of the common stock of Smith & Company, which is to be cancelled and not to be reissued.

"(2) Smith & Company waives all claim and title in and to 13,000 shares of capital stock of the Securities Company, which is to be cancelled and not reissued.

"(3) Smith & Company cancels the indebtedness of the Securities Company to Smith & Company in approximately the sum of $211,000.00.

"(4) Smith & Company assumes and agrees to pay the entire indebtedness and obligations of the Securities Company of certain debenture bonds of which there were outstanding something less than $120,000.00.

"(5) Smith & Company assumes and agrees to pay the indebtedness of $509,000.00 due from the Securities Company to Burgess-Nash Company. In assuming such indebtedness Smith & Company does not assume or agree to pay any part or portion of the alleged indebtedness of $250,000.00 due Burgess-Nash Company from the Securities Company, and which is connected with or arising out of the alleged sale of certain stock of the Burgess-Nash Company to the Securities Company.

"(6) It is recognized and admitted that the $200,000.00 promissory note of Smith & Company held by the Omaha National Bank of Omaha is the direct obligation of Smith & Company, and never was the obligation of the Securities Company.

"(7) The Securities Company assigns to Smith & Company all its right, title and interest in and to all policies of insurance upon the life of Ward M. Burgess held by the Omaha Trust Company as security to the debenture bonds issued by the Securities Company, and turns over to Smith & Company its cash on hand and in the bank in the sum of $————."

The referee finds that the evidence does not convince him that the contract of May 7, 1924, was fraudulent so far as the first preferred stockholders are concerned. The trial court confirmed this finding, and we concur in that conclusion.

Appellants, first preferred stockholders, holding 123 shares of the $887,900 outstanding, became dissatisfied with the business situation which did not promise success so far as the stockholders were concerned. December 4, 1924, a stockholders' suit was filed against the so-called syndicate members, consisting of Woods Bros., Megeath, Teagle, Smith & Co., and the Securities Company, to recover upon an alleged contract liability of $2,600,000 for the increase of the common capital stock issued to the Securities Company, which, it was asserted, was not paid up in accordance with the demand of the Nebraska law. Shortly thereafter the creditors precipitated proceedings in bankruptcy, and January 15, 1925, the Smith Company was adjudicated a bankrupt. Appellee Loomis was duly made trustee. Thereupon an amended petition was filed to the stockholders' suit in the state court, by which the trustee was made a party, and the following claims were asserted:

"$2,600,000.00—Upon a contract obligation for the par value of 26,000 shares of common stock issued after the formation of the syndicate to M. E. Smith Securities Company.

"500,000.00—Upon a contract obligation for 5,086 shares of common stock issued to M. E. Smith Securities Company.

"211,956.07—Representing moneys of M. E. Smith & Company wrongfully diverted and converted to M. E. Smith Securities Company.

"884,907.52—Representing moneys of M. E. Smith & Company wrongfully diverted and converted to Burgess Nash Company.

"442,406.67—Representing money of M. E. Smith & Company wrongfully diverted and converted to pay personal obligations of A. C. Smith, Ward M. Burgess and Louis C. Nash."

The trustee on his part made claim for substantially the same amounts against the same parties, including Woods Bros. Corporation, and adding Ward M. Burgess. American Stocks and Bonds, Limited, a corporation, alleged to be owned and controlled by Teagle, also appears as a party defendant in the stockholders' suit in the state court. March 6, 1925, Mark W. Woods, George J. Woods, and Frank H. Woods, without in any manner admitting liability for any of these claims, submitted an offer to pay to the trustee $125,000 in full compromise and settlement of all such alleged claims, not including, however, any cause of action the trustee might have against S. A. Megeath, Walter Teagle, and American Stocks and Bonds, Limited, or either of them. This offer was submitted by the trustee to the referee. The latter called a meeting, at which 90 per cent. of the creditors were represented, and voted to approve and accept this offer of compromise. Upon the objection of appellants, however, the action of the referee was deferred, and a full hearing was accorded. The referee ordered that the offer of compromise be approved, and his order was confirmed by the District Court. This appeal followed.

In determining the advisability of accepting an offer of compromise, many considerations are addressed to the sound discretion of the referee and chancellor, among them: (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

The decision of a referee in bankruptcy, as of a master in chancery, when approved and affirmed by the court, will not be set aside, if it finds substantial support in the record and in the law applicable thereto. The record presented easily convinces that the Smith Company was, in effect, insolvent at the time this plan of reorganization was formed. This was apparently due both to loss of patronage and to defects in management by which the funds of the company had been deflected from the channels of its business, as evidenced by the intercompany obligations disclosed. It is evident that Ward M. Burgess, in September, 1922, was interested above all others in rehabilitating the company. He had large outstanding obligations that could not be discharged, unless Smith & Co. could be made to succeed, or unless, through it, additional capital could be enlisted which might be employed to relieve his financial ills. He therefore sought to and did interest appellants in this enterprise. M. E. Smith & Co., Incorporated, had had a

profitable business existence for nearly half a century. Its later years had been less successful, but there appeared to be no reason why, with good management and sufficient working capital, it might not be restored to its former status. It should be remembered, therefore, that the appellants in this case entered upon this project with no apparent purpose to wreck the Smith Company. The motive is entirely lacking. They invested a substantial amount of their own money. They were instrumental in inducing a financial institution of Chicago, in which they were interested, to loan large sums to the proposed new enterprise. Their holdings were almost entirely of the common stock—they owned none of the first preferred—and the legitimate success of the business was essential to any profit they could hope to realize as stockholders. They received none of the money alleged to have been diverted from the Smith Company to any of the allied or related corporations. The record does not disclose that they ever received a penny in the way of dividends, or otherwise, during the entire period of operation. It does disclose that they turned over to the Smith Company all that remained constructively in their hands through the Securities Company, or through any other holding, and now offer to pay the substantial sum of $125,000 in settlement of any claim that has been made against them. These things are in themselves not decisive of the questions before the referee and court, but they have a bearing upon the inferences to be drawn from the happenings disclosed by the record.

The appellees in this case made none of the representations complained of to the bureau of securities of the state of Nebraska. They were not subscribers to the increase of the common capital stock in the amount of $2,600,000. They took no part in the alleged diversions of capital charged. They are sought to be held as parties to a joint adventure, and therefore responsible for the acts of Burgess and others who were parties thereto. The court below held that the joint enterprise, in so far as it was one, could not be so extended as to cover the acts of Burgess, of which appellants had no knowledge,

and from which they received no benefit. However, we do not think it necessary to decide this point. It is found that the claims filed and allowed against Smith & Co. aggregated $4,127,580, of which $1,774,859.65 have already been paid in dividends, leaving $2,-352,720.65 outstanding. But $90,000 remain in the hands of the trustee. It will be seen, therefore, that the greater part of the entire amount claimed against appellees must be recovered before anything could be realized for the first preferred stockholders. It is conceded that the claims of creditors must ordinarily come before those of stockholders of any degree, but it is insisted that both creditors and their trustee are estopped to assert any interest in the recovery sought as against the first preferred stockholders, "because of their action in attempting to release the settlement proponents from the claims (against appellees) and in acquiescing in and failing to repudiate the agreement and resolutions of the Board of Directors of May 7, 1924." We do not think this contention can be indulged. The creditors, in permitting the business to continue for a time, in no sense became responsible for its administration, nor for any agreements between the corporation and third parties. The trustee, now, is asserting these claims against appellees for the benefit of creditors primarily, and is governed by their decision as approved by referee and court. We find no basis for the estoppel urged. The claims made are obviously debatable, and recovery, at least in any amount that would inure to the benefit of appellants, is highly speculative and uncertain. By the terms of the proposed compromise, claims against parties other than appellees are expressly not released. The whole matter, therefore, resolves itself into the question of whether the action of the court in approving the compromise amounts to an abuse of discretion. Unless that compromise is clearly unreasonable and improvident, the decision of both referee and court should not be disturbed. The creditors should not be compelled, against their unanimous wish, to engage in protracted litigation at large cost and of uncertain issue.

We conclude that the decree should be affirmed, and it is so ordered.