**In re Neil Brian GREENACRE, Debtor.**

**Bankruptcy No. 87–20420.**

United States Bankruptcy Court,
D. Maine.

June 30, 1989.

Jeffrey A. Schreiber, Tali A. Tomsic, Salem, Mass., Stuart M. Holber, Phillips, Gerstein, Holber, Laflamme, Migliori & Barron, Haverhill, Mass., for trustee.

Matthew L. Caras, A. Mark Horton, Verrill & Dana, Portland, Me., for Maine Sav. Bank.

Neil B. Greenacre, Lower Sackville, Nova Scotia, Canada, pro se.

James Fierberg, Goldman, Albano, Caruso and Fierberg, Springfield, Mass., for Neil B. Greenacre in the District Court Proceeding, C.A. No. 88–0054–B.

Gary J. Norton, Bangor, Me., for Seaboard Federal Credit Union.

Gerrard F. Kelley, Boston, Mass. U.S.T.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, JR.,
Bankruptcy Judge.

Heard on June 7, 1989, on the Joint Motion of the Trustee and the Maine Savings Bank, pursuant to Bankruptcy Rule 9019(a)[1], for approval of a compromise to which they have agreed, and which would conclude an action pending before the United States District Court for the District of Maine. The debtor, who is a co-plaintiff in this action, but was not privy to the settlement negotiations, objects to the proposed compromise. The United States Trustee, and several unsecured creditors who responded to the notice, support the motion.

---

1. Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing on notice to creditors, the debtor and indenture trustees as provided in Rule 2002(a) and to such other entities as the court may designate, the court may approve a compromise or settlement."

For the reasons discussed below, the motion is denied.

## BACKGROUND

On November 19, 1987, the Trustee and the debtor, Neil Greenacre, jointly filed a complaint, verified by the debtor, against the Maine Savings Bank, with a request for jury trial, in the United States District Court for the District of Maine. Of the original seven counts alleged in the complaint,[2] two have been dismissed with prejudice.[3] In December 1988, the plaintiffs amended the complaint which now includes counts alleging fraud, negligent misrepresentation, negligence, and negligent infliction of emotional distress.

The essence of the suit, as far as this Court is aware, based on a review of the pleadings filed in the bankruptcy case and in the District Court, depositions of proposed witnesses in that litigation, and the arguments of counsel and the debtor himself, is that during 1984, the Bank allegedly made oral and written commitments to the debtor and his family to lend them approximately $99,000 to build a house.[4] After the debtor had committed himself to the construction of the house, in reliance on the Bank's assurances that the loan was forthcoming, there began a series of delays of the loan closing, and inconsistent representations from the Bank relating primarily to changes in loan conditions, and payment of subcontractors and family members from whom the debtor had been advised to, and in fact did, obtain "bridge loans." After literally months, and numerous postponements of the closing, with the house nearing substantial completion, but by then covered with mechanic's and materialmen's liens, the Bank finally announced that it would not loan Greenacre the promised money. The following paragraphs excerpted from the complaint more fully describe these allegations:

11. In or about the first week of May, 1984, Kirkland summoned Greenacre to his Brewer office. Kirkland advised Greenacre that the bank would reject the loan as a construction loan because construction had already started on the property. Kirkland advised, however, that the bank would extend the loan as a home mortgage loan. Before the bank would extend the loan, Kirkland stated, all construction would have to be complete. Kirkland suggested that Greenacre hire contractors and obtain personal loans from other sources to serve as a "bridge loan" until the home mortgage loan from the Brewer Bank was closed. Kirkland also suggested to Greenacre that Greenacre borrow money from his parents to cover the costs of construction during the time the construction was completed.

. . . .

13. The following day, through his secretary, Kirkland again called Greenacre to summon him to his Brewer office. At that meeting, Kirkland congratulated Greenacre on the bank's commitment to loan Greenacre 90% of the appraised value of the property on the condition that certain fully bonded building contractors complete the construction on the Greenacres' home. Subject to the Brewer Bank's commitment to loan the money, Greenacre planned to borrow $10,000.00

---

2. The seven counts were: (1) breach of contract; (2) violation of the Fair Credit Reporting Act; (3) breach of the implied covenant of good faith and fair dealing; (4) intentional infliction of severe emotional distress; (5) defamation; (6) misrepresentation; and (7) unfair trade practices.

3. The District Court dismissed, with prejudice, the Fair Credit Reporting Act claim and the count alleging violation of the Maine Unfair Trade Practices Act. The misrepresentations count was dismissed without prejudice, with leave to the plaintiffs to reallege it later. In addition, the District Court dismissed the puni-

tive damage claims relating to the breach of contract and breach of implied covenant of good faith and fair dealing counts.

4. The complaint alleges that, initially, the Bank agreed to advance the debtor $75,000 as a construction loan to complete the building of his house. Later the Bank decided that because construction had already begun, it would have to classify the loan as a home mortgage loan. "The Bank" refers to the Brewer Bank, with whom the debtor originally did business. Brewer Bank subsequently merged with the Maine Savings Bank, sometime in 1984.

from his mother to complete the construction pending closing of the loan. At that meeting, Greenacre said to Kirkland, "I am not going to borrow $10,000.00 from my mother unless the loan is guaranteed." Kirkland replied words to the effect that the loan has been accepted and that the Brewer Bank would have no problem in writing the loan in six weeks as long as the house is completed. At that meeting, Kirkland, in behalf of the Brewer Bank, again agreed to loan the Greenacres up to 90% of the appraisal, which was $99,000.00.

14. Subsequent to the meeting described in paragraph 13, both Greenacre's mother and brother, both of whom agreed to make funds available to Greenacre, contacted Kirkland to receive assurances that the monies lent to Greenacre would, in fact, be repaid from the closing. Kirkland, in fact, provided such assurances, and in reliance thereupon, Greenacre's mother and brother both agreed to loan funds to Greenacre.

15. In or about the third week of May, 1984, upon reliance on the representation of Kirkland, Greenacre contacted various building contractors and suppliers to arrange a work schedule to complete the Greenacres' home. Upon instruction from Kirkland, the contractors and suppliers were told to contact Kirkland and/or the bank's attorney to confirm that all costs would be paid at the anticipated closing, and that it would be proper to commence construction. On information and belief, numerous contractors and suppliers, in fact, sought and received the assurances from Kirkland and/or bank counsel, and in reliance thereon, commenced work on the job site. Greenacre also began to borrow money from his family, Merrill Bank, North Star Bank, Seaboard Federal Credit Union, MSB, and the Bar Harbor Bank and Trust Company. The purpose of these loans was to serve as "bridge loans" to fund the construction of the house to its completion and were undertaken at the instruction, advice and representation of Kirkland. Greenacre anticipated that

these loans would be paid from proceeds of the loan from the Brewer Bank.

. . . .

20. On July 27, 1984, Greenacre was notified that the closing would be postponed for one week because the necessary documents to close the loan had not yet been sent to the Brewer Bank from the MSB offices in Portland. Subsequently, Greenacre was told that the closing would take place on August 7, 1984. On August 7, 1984, the closing was again postponed by the Brewer bank. The Brewer bank rescheduled the closing to take place on August 9, 1984. On August 8, 1984, the Brewer bank postponed the closing to the following week with no fixed date. The following week, the Brewer bank sought to change the terms of the loan, despite its oral and written loan commitment and terms for extending the loan, including placing a condition on the Greenacres to post a bond. The bank then rescheduled the closing for August 23, 1984. On August 23, 1984, the bank postponed the closing to take place on August 25, 1984, which was again postponed to September 5, 1984 and then postponed to September 19, 1984.

21. The numerous cancellations of the closing date established by MSB were predicated upon last minute conditions being interposed by MSB, including, without limitation, the posting of a bond, completion of landscaping, acquisition of a water test, installation of final carpeting, and a constant and continuing inability and/or disinclination of MSB to provide the necessary closing documentation.

22. On September 19, 1984, the Greenacres, with their attorney, met at the Brewer bank with the expectation to finally close the loan. At that time, the Greenacres were told by their attorney, after he privately met with a bank officer, that the bank refused to close the loan despite its prior numerous commitments to do so. In the meantime, subcontractors and other creditors the Greenacres had hired to work on their home, based upon Greenacres' expecta-

tion and reasonable reliance that the loan would be closed in July, filed liens and began to foreclose on the Greenacres' home.

Because of the Bank's belated, and allegedly wrongful refusal to go through with the loan, and amid allegations, inter alia, of dual legal representation and conflicts of interest, Greenacre incurred substantial damage, including the need to file for relief under the United States Bankruptcy Code.

## THE PROPOSED SETTLEMENT

After the filing of the civil action in Portland, the parties conducted extensive discovery, including production of documents, requests for interrogatories, and numerous depositions.[5] Upon completion of the depositions, the Trustee and the Bank engaged in the first serious settlement negotiations, which, strangely, did not include the debtor.[6] The proposed "Compromise of Claims" is the end result of those negotiations. The significant terms of the settlement are as follows: (1) The Bank will pay to the Trustee and the estate $32,500; (2) The bank will assign to the Trustee and the estate all rights against Mr. Greenacre arising out of a certain note and mortgage given to the Bank by Mr. and Mrs. Greenacre, expressly reserving any and all rights and remedies against Mrs. Greenacre under the said note and mortgage to the full extent of her liability; (3) All claims against the Bank by the Trustee and Neil Greenacre will be

released and discharged; (4) The District Court action, C.A. No. 88–0054–B, will be dismissed in its entirety with prejudice; and (5) the Bank shall assign to the Trustee and the estate, all right, title and interest it may have in the Bangor real estate. The Trustee represented that the "net" economic benefit to the estate, considering the savings in further litigation expense, will be approximately $100,000. If approved, the settlement will include the payment of all administrative claims, and a 53% dividend to unsecured creditors (*see* Memorandum of Law of the Chapter 7 Trustee and Maine Savings Bank in Support of the Settlement of all Claims against Maine Savings Bank, p. 25, n. 6, dated May 4, 1989.) As proposed, Mr. Greenacre will receive nothing. The Trustee, the Maine Savings Bank, the United States Trustee, and the unsecured creditors who responded, favor the settlement on the terms noted above. The debtor, individually, and through his attorney in the District Court action, James Fierberg, disagree, and argue that the plaintiffs will likely achieve a substantially higher result if the action is allowed to proceed to trial.[7]

## DISCUSSION

■■■ Rule 9019(a) vests the Court with sound discretion to determine whether to approve a compromise. *In re Hydronic Enterprise, Inc.*, 58 B.R. 363, 365 (Bankr. D.R.I.1986); *In re Sherman Homes, Inc.*, 28 B.R. 176, 177 (Bankr.D.Me.1983). How-

5. Based on the pleadings, the evidence, and the arguments, we conclude that most, if not all, of the plaintiff's discovery was done by the debtor, at his expense. Also, it was solely the debtor's initiative which caused the instant complaint to be filed, after he filed a motion for authority to commence his own adversary proceeding because of the Trustee's continuous refusal and failure to do so. *See* Debtor's Motion, dated October 27, 1987 and Objection of Trustee, dated October 29, 1987.

6. Mr. Fierberg, the debtor's attorney in the District Court action, also suggests that settlement talks took place between the Bank and the Trustee prior to the completion of discovery. We have no knowledge of said discussions, and do not know whether they are relevant to the issues before us.

7. According to the Trustee, if the proposed compromise is approved, the debtor will receive no direct financial benefit, aside from the expected 53% distribution to his unsecured creditors. We question this 53% figure however, since the Trustee's calculations do not appear to include attorney Fierberg's fee for services, or expenses. In the addendum to the Complaint, the debtor requests damages in excess of ten (10) million dollars. While debtor's counsel candidly admitted that the pending suit is not presently valued at this amount, he felt confident that the recovery would be significantly higher than the amount settled upon, and would likely result in a monetary award to the debtor, after a 100% payment to creditors. Greenacre also objects on the ground that the settlement, as proposed, contemplates full payment to a number of lien creditors whose claims have been listed as "disputed."

ever, in reviewing a proposed settlement, the Court is guided by four criteria, *see Drexel v. Loomis*, 35 F.2d 800 (8th Cir. 1929), to assist it in making this determination:

> (1) The probability of success in the litigation;
>
> (2) The difficulties, if any, to be encountered in the matter of collection;
>
> (3) The complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and
>
> (4) The paramount interest of creditors and proper deference to their reasonable views.

*Drexel*, 35 F.2d at 806, *see also Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *In re Continental Investment Corp.*, 637 F.2d 8 (1st Cir.1980); *In re Hydronic Enterprise, Inc.*, 58 B.R. at 365.

■ While it is settled that "the law favors compromises," *In re Sherman Homes, Inc.*, *supra*, at 177 (citations omitted); *In re Hydronic Enterprise, Inc.*, *supra*, at 365 (citations omitted), it is also clear that the proponents of the compromise, here the Trustee and the Maine Savings Bank, have the burden of persuading the Court that the proposed settlement is reasonable and in the best interest of the estate. *In re Bell & Beckwith*, 93 B.R. 569 (Bankr.N.D.Ohio 1988).

1. **Probability of Success**

■ In arguing that the settlement is reasonable in relation to the probable recovery at trial, the Trustee and his counsel rely almost exclusively on their concern over the debtor's credibility, which they characterize as "thin." They contend that Greenacre's poor performance as a witness is a foregone conclusion, as evidenced by numerous inconsistent statements, and his behavior in general. In addition, the Trustee testified that in his opinion the value of these claims is diminished directly in relation to Greenacre's "tirades."[8] In response to the Court's "hypothetical" inquiry, the Trustee did acknowledge that *if* Greenacre were a good witness, the value of the pending claims would be substantially higher. However, since in the Trustee's view that is definitely not the case, he contends that "there is no contest, and that the proposed settlement is better than putting all of the odds in Greenacre's credibility." Moreover, he feels that the outcome of the litigation depends entirely upon the veracity of the debtor, versus the credibility of the Bank's witnesses, all of whom the Trustee and his counsel find to be credible and convincing.[9]

The debtor and James Fierberg, his attorney in the District Court action, have both characterized the proposed settlement as a "sellout," and they question the Trustee's commitment to the case. Fierberg, in particular, expressed apprehension that the Trustee had given up all hope of success in the pending litigation. In this regard, he reported on the history of the discovery process conducted by the "co-plaintiffs," noting that the debtor, who was not included in the settlement negotiations, was only told of the agreement "as a courtesy." Fierberg, who was present with his co-counsel, Mark J. Albano, Esq., during the totality of the depositions,[10] stated that Greenacre came across as rational and in control, exhibited no outbursts, and was in fact a calm and believable witness, with a

---

8. The Trustee described the debtor as having a volatile personality, with a tendency to harass, and a general use of very profane language. Even if he were tempted, or baited, to do so, and we seriously doubt that he would, we feel confident that the debtor would not be allowed to behave in an abusive or profane manner during the trial, either in or out of the presence of the jury.

9. Although there have been several conclusory representations by the Trustee and counsel to the effect that "the bank has defenses," we have heard *nothing* specific in this regard. Likewise, we find the Trustee's favorable portrayal of the Bank's witnesses far too general and unsupported to be of any assistance in making our determinations here.

10. It is our understanding that while the debtor and his attorney(s) were present for every minute of every deposition, the Trustee did not attend any of the depositions, and his attorneys were not always present for the deposition process.

good story to tell. On the other hand, Fierberg described the depositions as "damaging" to the Bank. The debtor's personal concerns center mostly on the Trustee's negative bias regarding this lawsuit,[11] and his belief, which we question, that the Trustee has a fiduciary duty to the debtor which he is not fulfilling.

Based on all of the foregoing, and recognizing the sharp differences of opinion present, we find that the Trustee has not met his burden of showing that the proposed settlement is reasonable and in the best interest of the estate. We certainly agree that the credibility of witnesses is an element to be considered in evaluating claims, and in predicting the outcome of litigation. However, where, as here, the attorneys for the two plaintiffs have opposite views as to the caliber of Greenacre as a witness, we choose to give greater deference to the assessment of Fierberg, who has the most experience and familiarity with Mr. Greenacre, as well as the greater "hands on" pre-trial involvement in the lawsuit. In fact, Mr. Schreiber has even characterized Fierberg as "the lead counsel" in this litigation. Accordingly, we accept and agree with Mr. Fierberg's positive opinion of the value of the debtor as a witness, over the negative assessment of the Trustee and his counsel.[12]

In addition, except for the issue of Greenacre's credibility, the Trustee has not offered any other reason to support his position. Although we are not inclined to accept the debtor's characterization of the compromise as "a sellout," we share his concern over the Trustee's commitment to this lawsuit, as well as the accuracy of the Trustee's assessment of the settlement value of the claims. In this regard, the Trustee does not address the issue of the Bank's

potential lender liability under the promised home mortgage loan, nor the substantial damages claimed, and he makes no reference whatsoever as to Greenacre's claims based on negligence, negligent infliction of emotional distress, negligent misrepresentation or fraud, any or all of which, if proven, could produce an award far in excess of the present offer. In addition, from evidence adduced at the hearing, we found particularly significant, and relevant, the allegations regarding the merger of Brewer Bank with the Maine Savings Bank, and the detrimental effect on Greenacre of the change in employment status of the former president of the Brewer Bank, Kenneth Kirkland, whose representations were relied upon by Greenacre, and which led him to the dilemma in which he finds himself.[13]

During the hearing and on brief, the Trustee only discussed the claims based on breach of contract, and in fact argued, incorrectly in our view, that unless the jury finds that a contract existed between the debtor and Maine Savings Bank, the plaintiffs will receive nothing. This reinforces our finding that the Trustee completely discounted and/or ignored Greenacre's claims sounding in negligence, and further substantiates our conclusion that the proposed settlement falls far below the lowest point in the range of reasonableness. *See In re Hydronic Enterprise, Inc., supra,* at 366.

Finally, because this will be a jury trial, wherein Greenacre could well come across as a classic peer of the men and women judging him, and that a target defendant able to respond to any judgment is involved, also support the conclusion that the proposed settlement is unreasonably low.

---

**11.** Fierberg argued at length about the amount of discovery the debtor has conducted, as opposed to that undertaken by the Trustee. While this argument is not germane to a determination of the likelihood of success of this litigation, it does raise the Court's concern over the Trustee's commitment, and the extent to which he is prepared to effectively prosecute the action.

**12.** Based on the entire record before us, including the depositions, which have been read in

their entirety, it is the conclusion of this Court that the proposed settlement is clearly below the lowest point in the range of reasonableness.

**13.** Put simply, it is Greenacre's contention that Kirkland made promises and gave assurances to Greenacre which were withdrawn after Maine Savings Bank acquired Brewer Bank and demoted Kirkland. This factual issue is well within the ability of a jury to understand and handle.

We find all of these factors to be potentially significant, and likely to carry weight before a jury, and that they have been completely overlooked by the Trustee in his assessment of the settlement value of the case.

## 2. Difficulties in Collection

Since no argument was made concerning any problem in collecting a judgment against the Bank, we see no reason to address that point. The Trustee did argue, however, that the creditors, the estate, and the debtor would be further delayed in the resolution of this matter and in any ultimate payment, by the appeal which would inevitably follow an adverse result against the Bank. We do not find the threat of an appeal by the Bank to be a valid reason for approving this settlement. If the plaintiffs are successful, and are awarded substantially more than the Bank is now offering, the added delay will not have been significantly detrimental to creditors—in fact the accrual of additional interest will only inure to their benefit. We, therefore, reject the Trustee's argument based on the fear that the Bank would appeal a result not to its liking.

## 3. Complexity, Expense, Inconvenience and Delay

The Trustee, the Bank, and one of the creditors, Seaboard Federal Credit Union, voiced concern over the added expense and time which will be incurred in preparing and trying this case in the District Court. Moreover, the Trustee raises concerns about the complexity of the issues.

We find no merit in either argument. Discovery has been largely completed, including the depositions of key witnesses, and the case is presently on Judge Carter's July–August trial list. Mr. Fierberg also represented that he is ready to go forward at this time, and does not foresee any reason for delay. Of course, a trial will mean added expense, but this fact, by itself, is insignificant when one weighs the exposure of the defendant against the cost of trial, particularly where the bulk of the discovery expenses have already been incurred. We also reject the Trustee's (unfounded) suggestion that a jury would not be able to comprehend the legal and factual issues involved.

## 4. Creditors' Views

Although the proposed settlement has not been objected to by creditors or the United States Trustee, neither does it follow that creditor acquiescence means that the compromise is in the best interest of the estate. Greenacre's creditors have been waiting a long time, in excess of four years, for any distribution. Understandably then, they are willing (maybe anxious) to forego the possibility of a more substantial dividend, in order to receive a distribution now. We cannot countenance the approval of a compromise for that reason, when we believe the offer is much too low. In addition, although the Trustee and the Bank argue otherwise, we believe that Greenacre's interest here is one not always present in a Chapter 7 case, and should not be overlooked solely because the Trustee and the Bank have reached a private accommodation. If the litigation produces an award in excess of the amount needed to pay all administrative claims and a 100% distribution to creditors, then the surplus will be the property of Greenacre and his family.[14] "[T]here is decisional authority supporting the proposition that, where, as here, there will be sufficient assets in the bankruptcy estate to create a surplus of assets to be returned to the debtor, the debtor does have standing to object to the Trustee's proposed compromise." *In re Carson*, 82 B.R. 847, 854 n. 8 (Bankr.S.D. Ohio 1987) (citations omitted). The exclusion of the debtor, who is a co-plaintiff in the lawsuit, from the settlement talks, constitutes a serious, substantive defect in the instant motion, particularly in light of his extensive and leading involvement in both

**14.** Without deciding what, if any, potential interest Mrs. Debra Greenacre has in any recovery from this lawsuit, we note the existence of questions such as the binding effect upon her of any settlement, the failure to notice her in any of the pending matters, and the fact that she is neither a plaintiff nor defendant in this civil action.

the initiation of the litigation, and in the discovery process. Finally, Greenacre's rights should not be overlooked or reduced because he has been (and probably still is) litigious and confrontational, and possibly his own worst enemy. We have observed Mr. Greenacre both on and off the witness stand, have read his two-day, 350+ page deposition, and disagree that his demeanor as a witness will be the disaster that the Trustee foresees. While such a finding is obviously a subjective one, we are firmly convinced that the far better course is to allow this matter to proceed to trial, with a jury deciding the ultimate factual and credibility issues, and let the chips fall where they may. That way, Neil Greenacre will have had his full day in court, as will the Maine Savings Bank, which surely deserves to be vindicated, if its position is correct.

Accordingly, the Trustee and the Maine Savings Bank's Joint Motion for Approval of the Compromise of Claims is DENIED.

Enter Judgment accordingly.