In re APEX OIL COMPANY, et al., Debtors.

Bankruptcy No. 87–03804–BSS.
Motion Nos. 04–140–C, 04–143–C.

United States Bankruptcy Court, E.D. Missouri, E.D.

Nov. 8, 1988.

Arnold M. Quittner, Robert Jay Moore, Paul S. Aronzon, Gendel, Raskoff, Shaprio & Quittner, Los Angeles, Cal., Dennis A. Ferrazzano, Barack, Ferrazzano and Kirschbaum, Chicago, Ill., Milton B. Hyman, Irell & Manella, Los Angeles, Cal., Special Counsel), for debtors.

Alan N. Salpeter, Howard J. Roin, David S. Curry, Mayer, Brown & Platt, Chicago, Ill., Cherie Erickson Harris, Mayer, Brown & Platt, Los Angeles, Cal., for AOC Acquisition Corp.

Gregory D. Willard, Laurence M. Frazen, Bryan, Cave, McPheeters and McRoberts, St. Louis, Mo., Stephen J. Blauner, David C.L. Frauman, Milbank, Tweed, Hadley and McCloy, New York City, for The Lender Group.

Lloyd A. Palans, Gallop, Johnson and Neuman, St. Louis, Mo., Examiner.

Steven N. Cousins, Armstrong, Teasdale, Kramer, Vaughan & Schlafly, St. Louis, Mo., for Unsecured Creditors Committee.

Matthew Gluck, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Getty Petroleum Corp.

Sharon F. Daily, Greensfelder, Hemker, Wiese, Gale & Chappelow, St. Louis, Mo., for Murphy Co. Mechanical Contractors and Engineers.

Roger A. Ferree, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for Chemical Bank.

Steven M. Hamburg, Summer, Compton, Wells & Hamburg, St. Louis, Mo., for Curry Inv. Co.

Joseph F. Devereux, Jr., St. Louis, Mo., for Getty Petroleum Corp. and Getty Terminals Corp.

David E. Schaper, Keck, Mahin & Cate, Chicago, Ill., for Biscraft Indus. Scaffolding & Indus. Gunite, Inc.

Marjorie O. Rendell, Duane, Morris & Heckscher, Philadelphia, Pa., for Key Bank, N.A.

Arthur S. Weisbrodt, Charles P. Neuffer, III, Commercial Litigation Div., Economic Regulatory Admin. U.S. Dept. of Energy, Washington, D.C.

Charles D. Stodgill, Commercial Litigation Div., Civ. Div. U.S. Dept. of Energy, Classification Unit, Washington, D.C.

Frederick J. Dana, Asst. U.S. Atty., St. Louis, Mo.

Carol Chazen Friedman, St. Louis, Mo., Sheldon I. Hirshon, Ira M. Golub, Proskauer, Rose, Goetz & Mendelsohn, New York City, for NMU Pension Trust and Plan.

## MEMORANDUM OPINION

BARRY S. SCHERMER, Bankruptcy Judge.

### INTRODUCTION

On December 24, 1987, Apex Oil Company, a Missouri general partnership, and 51 subsidiary entities (hereinafter, collectively "Apex") filed voluntary petitions under Chapter 11 of Title 11 of the United States Code.[1] The cases have been procedurally consolidated and Apex has continued in possession and operation of its various businesses.

On September 1, 1988, Apex filed two motions: 1) For Approval Of Asset Purchase Agreement Among Debtors And AOC Acquisition Corporation And For Authority To Consummate The Transactions Contemplated Thereby (hereinafter the "Acquisition Motion"), and 2) To Approve Transfer Of Secured Banks Claims To AOC Acquisition Corporation (hereinafter the "Note Purchase Motion" and collectively, the "Motions"). The Motions seek approval of the transfer of a secured claim of $545 million to AOC Acquisition Corporation (hereinafter "AOC") who would pay $396 million cash for the secured claim and would then use the secured claim as "currency" along with the payment of additional cash and non-cash consideration to acquire substantial assets of Apex. In return, Apex would have the secured claim and numerous other claims asserted against it extinguished. Upon due notice

to more than 8,000 creditors, 16 objections were filed of which 13 were conditionally withdrawn prior and during the hearing on the Motions. During a three day hearing which started October 31, 1988, the Court heard from eight witnesses and received more than 100 exhibits into evidence.[2]

### JURISDICTION

This Court has jurisdiction over these Cases, Motions and subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, 1334 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" which the Court may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(D), (N) and (O). The statutory bases for the relief requested in the Motions are Bankruptcy Code § 363(b) and (f), 365 and 105(a) as complemented by Bankruptcy Rule 9013, 6004, 9019.

### FACTS

Apex owns and operates a vertically integrated business engaged in, *inter alia,* the refining, marketing and trading of petroleum products. Apex also owns a variety of other assets including recreational and commercial real estate throughout the United States. Apex has been reported as the fifth largest private company in the United States with 1987 sales in excess of $1.8 billion.[3] The principal assets of Apex are held through its subsidiary, Clark Oil & Refining Corporation (hereinafter "Clark"). Clark, which has been described as Apex's "crown jewel", owns three oil refineries and operates approximately 1000 service stations throughout the mid-western United States.

Apex purchased Clark in 1981 pursuant to a multifaceted development strategy. Through its acquisition of Clark, Apex was able to consolidate its petroleum business and operate as a fully integrated oil compa-

---

1. On October 11, 1988, two additional entities, Goldstein Oil Company (hereinafter "GOC") and Novelly Oil Company (hereinafter "NOC") filed voluntary chapter 11 petitions. Both the GOC and NOC cases were procedurally consolidated with the Apex cases bringing the number of Apex estates to 54. GOC and NOC are Missouri corporations and are the partners of the Apex Oil Company partnership.

2. Because the Motions were inter-related and their proof required many of the same witnesses and documents, a consolidated hearing was conducted.

3. Although total revenue exceeded $12.5 billion in 1983, it has steadily declined since that date.

ny. The Clark acquisition was financed by first priority secured loans from 12 banks (hereinafter referred to as the "Lender Group")[4] in the amount of $740 million. The terms of these loans were periodically amended and amounted to $545 million upon the filing by Apex of its Chapter 11 petitions on December 24, 1987.

On or about June 28, 1988, the Lender Group entered into an agreement to sell to AOC all claims and rights against Apex and various non-debtor affiliates, including pre-petition indebtedness and debtor-in-possession indebtedness (and all interest in the collateral for such indebtedness) for a total price of $396 million (hereinafter the "Note Purchase Agreement"). The Note Purchase Agreement contains no representations or warranties by the Lender Group regarding the validity or enforceability of their notes or liens. The approval of the Note Purchase Agreement is the subject of the Note Purchase Motion.

The Note Purchase Agreement required AOC to complete the purchase of the Lender Group's Claims before July 1, 1988; however, AOC had the option of extending this closing date by one sixty-day period and three successive thirty-day periods until November 27, 1988 upon payment of several non-refundable option payments to the Lender Group of $2 million each. AOC exercised its sixty-day option and two thirty-day options and has paid the required $8 million in option payments to the Lender Group. In addition, beginning on September 27, 1988 (*i.e.*, 90 days after the original closing date), the purchase price increased by an amount equal to 1% over the prime lending rate on $395 million of the total $396 million price, or approximately $120,-000 a day through November 27, 1988. AOC paid its last option payment on October 27, 1988.

The Note Purchase Agreement requires execution and delivery of releases by Apex, its principals (Messrs. Novelly and Goldstein)[5] and non-debtor affiliates against the Lender Group based upon any alleged misconduct by the Lender Group during the course of the lending relationship with the Apex estates.

The Note Purchase Agreement is tied to the Acquisition Motion in that the Note Purchase Agreement constitutes partial consideration for the transfer of assets under the Acquisition Motion. Apex seeks, via the Acquisition Motion, Court approval to sell Clark, certain other debtor assets and non-debtor affiliates to AOC. The Acquisition Motion is based upon an Asset Purchase Agreement pursuant to which AOC would purchase the following businesses and properties from Apex (hereinafter the "Purchased Assets"):

1. REFINING ASSETS. Three crude oil refineries would be included in the transferred assets: the Blue Island Refinery in Blue Island, Illinois; the Wood River Refinery in Hartford, Illinois; and the Mt. Airy Refinery in Louisiana.

2. PIPELINE INTEREST. Interests in various petroleum pipeline systems in the Midwest owned directly and indirectly by Clark would be transferred. Among these are minority interests in the Southcap, Chicap, Capewood, Wolverine, Gravcap and West Shore supply and finished product pipeline companies.

3. RETAIL MARKETING ASSETS. The retail gasoline marketing system consists of more than 1,000 service stations located in

---

4. The Lender Group is comprised of the following banks: Centerre Bank National Association, The Chase Manhattan Bank, The First National Bank of Chicago, Manufacturers Hanover Trust Company, Federal Deposit Insurance Corporation as assignee of and successor in interest to Continental Illinois National Bank and Trust Company of Chicago, Security Pacific National Bank, NCNB Texas National Bank, assignee from the Federal Deposit Insurance Corporation as receiver of First Republic Bank Dallas National Association, The First National Bank of Boston, Bank of America National Trust and Savings Association, Ameritrust Company National Association, First Bank National Associa-

tion (formerly known as First National Bank of Minneapolis) and Mercantile Bank National Association.

5. Hereinafter, all references to Mr. P.A. Novelly shall apply equally to Mr. Samuel Goldstein. Mr. Novelly is Chief Operating Officer of Apex, but he and Mr. Goldstein hold approximately equal interests in Apex and various non-debtor affiliates and therefore are "insiders" as defined in § 101(30) of the Bankruptcy Code. The interests at issue before this Court affect Messrs. Novelly and Goldstein equally.

Michigan, Illinois, Indiana, Ohio, Wisconsin and Missouri. Stations are also located in Minnesota, Kansas, Iowa, Kentucky, West Virginia and Pennsylvania. Approximately 971 service stations are open and operating, approximately 858 of which are operated on land owned by Clark and several Apex subsidiaries. The remaining stations are operated in land leased by Clark. As part of these retail marketing assets, the Asset Purchase Agreement proposes to transfer fixtures, inventories, accounts receivable cash and cash equivalents, and miscellaneous petroleum and non-petroleum products associated with these stations. Clark produces sufficient gasoline through its refineries to supply these stations.

4. CLARK TERMINALS. Fifteen of the product terminals which are fully integrated with the refining and marketing operations are also among the assets to be transferred. These terminals are also located primarily in the Midwest.

5. HOFTI. The Asset Purchase Agreements contemplates the transfer to AOC of Apex Holding Company's 50% interest in Houston Fuel Oil Terminal Company near Houston, Texas.

6. OIL AND GAS ASSETS. The assets of Apex Producing Co., Apex Kansas, Inc. and Apexco Exploration and Production, Inc. associated with the exploration and production of oil and gas would be transferred. The assets associated with this business include various interests in oil and gas leases and in producing and non-producing oil and gas properties.

7. COPPER MOUNTAIN. The Copper Mountain Ski Resort and associated assets owned directly, or through subsidiaries, by Copper Mountain, Inc., a non-debtor wholly-owned subsidiary of Apex R.E. & T.

8. WORKING CAPITAL. The working capital attributable to the businesses sold under the Asset Purchase Agreement.

9. MISCELLANEOUS. The Asset Purchase Agreement includes the transfer of certain miscellaneous real estate including a partnership interest in New York Brownstone Associates, Apex Travel, Inc. and Covey, Ltd.

In exchange for these assets, AOC would confer substantial benefits upon the remaining Apex entities (hereinafter "Residual Apex"). These benefits (hereinafter the "Purchase Consideration") include:

1. Conveyance to Apex of all claims and security interests in favor of the Lender Group which have a face amount of $545 million. This has the effect of relieving Apex from liability to the Lender Group for such claims and interests;

2. Assumption by AOC of Apex's post-petition current liabilities and current liabilities of non-debtor relating to the Purchased Assets, designated executory contracts and unexpired leases relating to the purchased assets and certain other liabilities, and acceptance of the purchased assets subject to certain permitted liens and encumbrances. These various liabilities and encumbrances aggregate approximately $85 million.

3. REAL ESTATE TAXES. AOC would satisfy all unpaid real estate taxes on the Purchased Assets. Apex estimates this would result in AOC satisfying up to $3 million in tax liabilities that would otherwise have to be satisfied by Residual Apex.

4. ST. LOUIS TERMINAL. Initially the Asset Purchase Agreement contemplated the transfer to AOC of the Mullanphy Street, St. Louis terminal. This asset, however, would remain with Residual Apex thereby retaining within the estate an asset with a value in excess of $3 million. This enables Residual Apex to retain a business operation which realizes significant revenues.

5. PROFESSIONAL FEES. $2 million would be paid to Apex to meet the prospective obligations to professionals retained by Apex for post-closing services. Apex estimates that the $2 million would satisfy all expenses incurred in connection with these Motions thereby liberating working capital for other operations.

6. INDEMNITY. AOC would provide an indemnity in the amount of $3 million to cover the defense costs and liabilities of all Apex's officers, directors and employees with respect to any asserted personal liability for tax claims and employee benefit

plan or employee welfare plan liability claims.

7. CASH. AOC would pay Apex $22.5 million cash and would guarantee that Apex retains a net working capital at closing of at least $15 million.

8. FUTURE DEALINGS.

A. In addition, the Asset Purchase Agreement states that AOC would provide accounting, management personnel and other administrative services to Residual Apex on a cost basis, for at lease one year following the closing. Additionally, AOC would enter into agreements with Residual Apex in which the latter would lease assets, and sell goods and services necessary for Residual Apex's continued operations to the former at fair market value. Those services necessary for operating the Purchased Assets that can be provided by Residual Apex will be provided to AOC on terms no less favorable than those available from any other business entity able to provide similar services. These various agreements are presently being negotiated by AOC and Apex.

B. At the closing of the Asset Purchase Agreement, The Horsham Corporation ("Horsham")[6] would issue a commitment letter in favor of the Apex estates under which Horsham, or a subsidiary thereof, would provide a $10 million Debtor-in-Possession loan facility terminable at the earliest of: confirmation of a Chapter 11 plan of reorganization; conversion of Apex's Chapter 11 cases to cases under Chapter 7; liquidation of a substantial portion of Apex's retained assets; the date upon which post-closing cumulative cash operating losses of Apex aggregate $15 million or more; or two years after consummation of the asset sale. The loan would be subject to the entry of this Court's order authorizing the borrowing and granting to AOC a senior lien against Apex's retained assets. The loan would bear interest at the rate of prime plus one percent (1%) and interest would be payable monthly or convertible to

---

6. Horsham Corporation, a corporation organized under the laws of the Province of Quebec ("Horsham") is the sole shareholder of AOC. A controlling interest in Horsham is owned by Peter Munk who holds 58% of voting control of Horsham. The stock of Horsham is listed and traded on the Toronto and Montreal stock exchanges. Messrs. Novelly and Goldstein presently own indirectly a total of approximately 13.9% of the issued and outstanding common stock of Horsham, which carries an approximate 6.6% voting interest. The ownership was acquired in June 1987 and is held through, A.I.C., Ltd., a company owned by Messrs. Novelly and Goldstein. From June 30, 1987 through May 25, 1988, Mr. Novelly served as director on Horsham's six-member board of directors and also served as a member of the audit committee of that board. Mr. Novelly resigned from the board once Horsham began direct negotiations with the Lending Group for the purchase of the Lender Group's Claims and did not act on behalf of Horsham during the negotiation of the Purchase Agreement.

Pursuant to the Shareholder Agreement for AOC Acquisition ("Shareholder Agreement"), upon the closing of the Asset Purchase Agreement:

(a) Messrs. Novelly and Goldstein will subscribe for an aggregate of 40% of the voting common stock of AOC for a contribution of loans and equity totalling $12 million. Horsham will obtain a 60% interest in AOC for a contribution of loans and equity totalling $18 million;

(b) Between two and five years after the Purchase Agreement closes, Messrs. Novelly and Goldstein jointly will have the option under the stock subscription agreement to purchase an additional 9.9% interest in AOC for $10 million, subject to the right of Horsham at any time to purchase at 90% of fair market value from Messrs. Novelly and Goldstein sufficient stock to give Horsham 75% ownership of AOC;

(c) Messrs. Novelly and Goldstein will have the right to select a number of directors in proportion to the shares held by them (40%); and

(d) A quorum of AOC's Board requires all of the directors. Certain extraordinary corporate transactions will require 90% board approval.

Under the Shareholder Agreement, Messrs. Novelly and Goldstein will obtain their interest in AOC for making the same *pro rata* investment as Horsham. Neither Mr. Novelly nor Mr. Goldstein has received any consideration from Horsham or AOC in connection with the Purchase Agreement other than the right to make a *pro rata* investment in AOC.

Under the Shareholder Agreement, Horsham will have the right to select AOC's management and control its operations. The quorum requirement and the limitations on the board's authority to approve extraordinary corporate transactions are customary provisions for privately held corporation and serve to protect the legitimate interests of minority shareholders. These provisions do no operate to abrogate Horsham's control over AOC.

a principal obligation, at the election of Residual Apex. At confirmation of a plan of reorganization, Residual Apex may elect to convert the Debtor–in–Possession loan facility into a one-year term loan bearing interest at the rate of prime plus three percent (3%). The term loan must be secured by collateral of a value that will be in a ratio of three-to-one with respect to the outstanding loan balance. The Asset Purchase Agreement contemplates that this Debtor–in–Possession loan facility and the post-confirmation term loan would give Residual Apex access to working capital necessary for enhancing the viability of the retained operations.

The entire package of benefits contemplated by the Asset Purchase Agreement, including the transfer of the Lender Group's notes pursuant to the Note Purchase Agreement, resists precise calculation. Many of the items offered as consideration for Clark, such as the promise of future dealings, elude liquidation. Nonetheless, Apex estimates the total benefit to exceed $1 billion.

Upon the filing of the Motions, 16 secured and unsecured creditors of Apex filed objections (hereinafter the "Objectors"). They are:

1. Curry Investment Co. ("Curry");
2. United States Department of Energy ("DOE");
3. First Fidelity Bank ("First Fidelity");
4. Key Bank N.A. ("Key Bank");
5. Murphy Company Mechanical Contractors and Engineers ("Murphy");
6. Biscraft Scaffolding Services, Inc. ("Biscraft");
7. Industrial Gunite, Inc. ("Industrial");
8. Sachs Electric Co. ("Sachs");
9. Union Electric Co.;
10. Warburton Valve Co., Inc. ("Warburton");
11. NMU Pension Plan and Trust ("NMU");
12. The Travelers Insurance Co. ("Travelers");
13. Mellon Bank, N.A. ("Mellon");
14. New York Life Insurance Co. ("New York Life");
15. Sun Exploration & Petroleum Co. ("Sun");
16. Getty Petroleum Corp. and Getty Terminals Corp. ("Getty").

Generally, these objections raised the following issues:

1. Whether the bidding procedures locked-out other bidders.
2. Whether the Note Purchase Agreement and Asset Purchase Agreement were entered into in good faith.
3. Whether the proposals embodied in the Motions will facilitate the development of a plan.
4. Whether the proposed sale is a sub rosa plan.

Additionally, the Objectors objected to the Motions on the grounds of inadequate notice and inability to evaluate the price paid by AOC without an appraisal of the fair market value of the Purchased Assets.

Prior to the October 31, 1988 hearing, thirteen of these objections were settled, conditional upon Court approval of the two Motions. The settlements are briefly described as follows:

1. Upon closing, AOC would pay approximately $1.1 million to five mechanic's lien claimants (Murphy, Biscraft Industrial, Sachs and Warburton) in satisfaction of their $1.3 million liens against the Wood River Refinery.
2. Upon closing AOC would pay $4.5 million to NMU in satisfaction of its claim for withdrawal liability and inadequate funding in violation of the Employee Retirement Income Security Act.
3. AOC and the DOE reached a conditional settlement of DOE's $350 million claim, to be satisfied in the amount of $15 million.
4. AOC agreed to either (a) purchase the $3.4 million claim of Mellon Bank (secured by certain assets of Apex's coal companies) and assign those claims to the Apex estates for their

benefit, in effect relieving Apex of those claims and freeing substantial retained assets of the coal companies from the Mellon liens, or (b) increase the purchase price by $2.25 million in cash, without affecting Mellon's claims against Apex's coal companies.

5. AOC would pay $2.3 million to Key Bank as adequate protection of its secured claim. Key Bank served as trustee for certain noteholders, secured by certain tugs and barges that will be retained by the Apex estates.

Three Objectors remained at the October 31, 1988 hearing: Sun, New York Life, and Getty. Sun objected to the Asset Purchase Agreement to the extent it fails to preserve an amount in the estate sufficient to satisfy its constructive trust claim. New York Life objects on the grounds that, *inter alia*, its security interest is being altered without procedural protections for a "cram down" under Chapter 11. Getty, the holder of a small, unsecured claim, vigorously objects to the Motions based on a 5% bust-up fee and an exclusivity provision.

The Asset Purchase Agreement contains a provision limiting Apex's ability to sell the Purchased Assets to a third party. Pursuant to the Asset Purchase Agreement, Apex may only sell the Purchased Assets to a third party if that party agrees to pay an amount greater than 105% of the purchase price (hereinafter 5% of the Purchase Consideration is referred to as the "Bust–Up Fee"). Under the Note Purchase Agreement the Lender Group's Claims are to be valued at their face amount, $545 million, rather than at the amount AOC has agreed to pay the Lender Group for those claims, $395 million (hereinafter the "Exclusivity Provision").

Getty objects to the Motions on the grounds that they require Getty to pay approximately $150 million more than AOC to purchase Clark, thereby effectively locking-out Getty, or other bidders, from acquiring the Purchased Assets. Neither Getty nor other bidders have access to purchase the Lender Group's Claims at the discounted price of $396 million. Getty has offered to purchase the Purchased Assets under the same terms as AOC has offered, except that (a) Apex would be required to renegotiate the aforementioned settlements with the sixteen objectors and (b) Getty would pay Apex an additional $85 million which it could then use to enter into the settlements with the thirteen settled Objectors. Getty argues that were it permitted to purchase the Lender Group's Claims at the same $396 million discount available to AOC, it would be offering more money than AOC. Consequently, Getty asserts, its offer should be accepted as it is in Apex's best interests to do so.

In support of its argument Getty postulates that the Exclusivity Provision which prohibits Getty from bidding for Clark from the same vantage point as AOC does so because the $150 million discount is being offered exclusively to AOC. Getty posits that this alleged lock-out provision exists solely because Mr. Novelly, Chief Operating Officer of Apex, has options to purchase a 49.9% interest in AOC and the Motions would not have materialized without Mr. Novelly's intervention.

Apex and the unsecured Creditors' Committee (hereinafter the "Committee") responded to Getty's argument by pointing to the fact that previous purchase proposals offered by Getty contained similar or identical provisions to the 5% Bust–Up Fee found in the AOC offer. Additionally, Apex asserts that such fees, as well as the exclusivity of the $150 million discount on the Lender Group's Claims, are not indicia of bad faith. Finally, Apex asserts that Getty has had ample opportunity to negotiate a purchase of Clark. The Clark assets have been universally marketed for several years and a market price has long-since been established. In fact, Apex argues, Getty has proposed at least 4 separate offers for the Clark assets, at least one of which included a lock-out provision similar to that found in the AOC Asset Purchase Agreement. Thus, Getty has had numerous opportunities to fully participate in the negotiations for the acquisition of the notes

and assets, as the following detailed history will show.

## History of the Clark Sale

On September 1, 1982, Apex and the Lender Group entered into a revolving Credit Agreement as periodically amended and restated (hereinafter the "Credit Agreement"). Pursuant to the Credit Agreement, the Lender Group made available to Apex a revolving credit facility in the approximate amount of $740 million. That facility enabled Apex to refinance the 1981 Clark acquisition and to finance Apex's trading operations.

Apex's indebtedness (the "Pre–Petition Indebtedness") to the Lender Group under the Credit Agreement is evidenced by certain promissory notes (the "Pre–Petition Notes") executed and delivered by Apex to the Lender Group. To secure the repayment of the Pre–Petition Indebtedness, Apex executed and delivered to the Lender Group certain security instruments pursuant to which Apex granted the Lender Group a security interest in substantially all of Apex's assets.

In August 1984, at Apex's request, the Lender Group agreed to provide additional funding required to restore the level of working capital that had declined as a result of operating losses suffered by Apex. Pursuant to that agreement, dated August 17, 1984, and in exchange for increased borrowings under the Credit Agreement, Apex granted the Lender Group security interests in Apex's remaining previously unencumbered assets.

In early 1984, Apex began to suffer serious losses as a result of falling oil refining and distribution margins. In late 1985, plunging oil prices exacerbated what were already unfavorable market conditions. At that time, Apex held long positions on thousands of futures contracts for crude oil. By July 1986, as a result of holding these long positions while oil prices plunged, Apex suffered losses that exceeded $95 million. In addition to these losses, the drop in oil prices reduced the value of Apex's physical inventory of oil by approximately $100 million. This deterioration in Apex's financial condition mirrored an equally profound deterioration in its relationship with the Lender Group. The lending relationship became increasingly acrimonious and distrustful during 1986.

April 1986 marked the commencement of the effort of Apex and the Lender Group to effect a reduction or satisfaction of the Pre–Petition Indebtedness through, among other things, a divestiture of the Clark refining and marketing operations. Apex retained Bear Stearns & Co. ("Bear Stearns") to explore different options for raising sufficient money to reduce or eliminate the debt to the Lender Group. In June 1986, Bear Stearns presented two alternative proposals for the sale of the Clark assets. The first proposal by Clarendon, the United States Division of Mark Rich & Co., AG, a large Swiss oil and commodity trader, involved a cash offer of $300 million for the fixed assets. The second proposal was made by a joint venture between Bear Stearns & Co. and Pacific Resources, Inc. ("PRI"). It involved a $300 million leveraged buyout to be financed by the Lender Group. Both proposals included provisions for replacement of the working capital (i.e., primarily oil inventories and receivables), the estimated values of which ranged from $80 million to $130 million. A condition of both proposals was that the Lender Group work with Apex to restructure the remaining indebtedness in order to provide the remaining Apex assets with sufficient working capital to conduct trading operations. The Lender Group encouraged Apex to pursue the cash sale as opposed to the leveraged buyout.

The Clarendon proposal included an option for Messrs. Novelly and Goldstein to provide 50% of the equity required for the transaction in exchange for a 50% ownership in the Clark assets to be sold. The negotiations with Clarendon terminated in the summer of 1986 when Clarendon reduced its offer to purchase the Clark assets by approximately $80 million. Negotiations for the leveraged buyout, however, continued. Apex reached an agreement with the Bear Stearns/PRI joint venture in August, 1986, but that deal eventually col-

lapsed when PRI withdrew from the joint venture in September 1986.

In November, 1986, Apex and the Lender Group entered into a Standstill Agreement pursuant to which the parties agreed to the basic terms for a sale of the Clark assets. Although no specific buyer for the fixed assets had been identified at that time, the parties agreed on the format for the sale of the Clark fixed assets, for refinancing the remaining Pre–Petition Indebtedness, and for the provision of a line of credit to Apex to finance its trading operations. Throughout this period Bear Stearns distributed offering memoranda to 28 energy companies, including Getty, for the sale of the Clark assets. Although several recipients failed to express an interest, approximately 20 companies, including Getty and Horsham Corporation, commenced varying degrees of due diligence investigations and/or direct negotiations with Bear Stearns and the Debtors. Several companies that did not receive the offering memorandum also actively pursued the possible acquisition of some or all of the Clark assets.

The Lender Group first discussed the possibility of selling its notes at a discount to a third party in October or November 1986.[7] At that time, Richard Rainwater made a proposal to the Lender Group to purchase the Pre–Petition Notes for approximately $260 million plus the value of Clark's working capital. The Lender Group was unwilling to accept a discount from the face amount of its Notes greater than $130 million. Because of an inability to reach agreement on price or financing contingencies, the negotiations with Rainwater were abandoned. The Rainwater negotiations are significant in that they marked the first time a consensus was received within the Lender Group to sell and/or satisfy the Lender Group's claims at a discount from their face value.

In January 1987, Apex presented a new proposal to the Lender Group for the sale of the Clark assets to Channel Refinery, a subsidiary of Clarendon, for a minimum of $430 million in cash, including $250 million for the fixed assets and $180 million for the working capital. Under this proposal, the Lender Group would retain a 10% interest in Clark, with Channel Refinery and Messrs. Novelly and Goldstein each acquiring 45% interests in Clark. The proposal was ultimately abandoned in May 1987, when it became apparent that there was a significant shortfall in Clark's working capital and an unwillingness by Apex to make up the difference from other sources.

**7.** The Lender Group believed that the value of their notes and their collateral had increased since the date the Note Purchase Agreement was executed due to (a) an improvement in wholesale and retail marketing conditions, (b) favorable settlement obtained by Apex from taxing authorities with significant priority claims against Apex, and (c) the rationalization of Apex's businesses that had been accomplished to date.

In light of various factors, including the Lender Group's perception of increased value of Apex's assets and the status of the cases, the $150 million discount on the Lender Group's Claims will not be available to AOC or any other party after November 25, 1988. The Lender Group is unwilling to postpone a sale of its Claims to AOC beyond November 25, 1988. If the Note Purchase Agreement [and the Asset Purchase Agreement] are not consummated by November 25, 1988 in accordance with their respective terms, the Lender Group threatens to oppose an extension of the Apex's exclusivity period and will try to force the liquidation of the Apex estates to satisfy its secured and, perhaps, unsecured Claims or to obtain relief from the automatic stay to foreclose upon the Lender Group's security interests in Apex's assets. In this regard, the Lender Group has completed the analytical and financial work necessary to prepare a liquidating plan to enable the Lender Group to realize cash from the proceeds of the sale of its collateral.

If the Note Purchase Agreement and the Purchase Agreement are not consummated by November 25, 1988 in accordance with their respective terms, the Lender Group may also terminate the post-petition credit facility. Since the commencement of the cases, administrative expenses for professional fees have averaged approximately $1 million per month in the aggregate. Throughout the cases, the Lender Group has reserved its rights under Bankruptcy Code § 506(c). In the event that the Note Purchase Agreement is not consummated by November 25, 1988 in accordance with its terms, the Lender Group has stated that it will no longer take what to date it claims has been a relaxed attitude towards such expenses. The threat of just such actions by the Lender Group served as one of the motivations for Apex to enter into the Asset Purchase Agreement.

On May 27, 1987, Apex proposed another transaction with Channel Refinery. The revised Channel Refinery proposal contemplated Channel's purchase of 45% of Clark. The purchase price consisted of $300 million for the Clark fixed assets plus the fair market value of the working capital at closing. Under the proposal the Lender Group was required to provide financing for the acquisition or take up to $75 million in debt/equity swaps, with certain assets of Apex subsidiaries pledged as collateral. In order to meet any shortfall, Apex also proposed to pledge to the Lender Group the equity of Clark Oil Trading ("COTC") a non-debtor affiliate. The Lender Group rejected this proposal.

On June 3, 1987, the Lender Group was advised by Apex that, as an alternative to the Channel Refinery proposal, it had negotiated a potential sale of all of Clark to Getty, a large independent marketer of gasoline and petroleum products based in Jerico, New York.

On June 9, 1987, Getty delivered a formal letter of intent (the "Getty Letter of Intent") to Apex and Clark containing the terms of its offer. A newly formed subsidiary of Getty would:

(i) acquire all of the assets of Clark, including the Toledo, Ohio and Rockford, Illinois terminals but not including Apexco, Covey, Ltd. and the Mt. Airy refinery and terminal, for the sum of $300 million in cash, plus an amount equal to the fair market value of Clark's inventories at the closing date of the transaction;

(ii) assume approximately $49 million in liabilities consisting of approximately $17 million in first mortgage obligations and up to $32 million in contingent liabilities such as the United States Department of Energy (DOE) unsecured claim against Clark; and

(iii) a holding company would be formed and granted an option to purchase a 50% equity interest in the new subsidiary, which would be exercisable for a 42-month period commencing on the 18th month after consummation of Getty's purchase.

Negotiations then took place between Apex and the Lender Group regarding the amount Apex would be required to pay the Lender Group in satisfaction of the Pre-Petition Indebtedness in exchange for the release of their liens on the Clark assets proposed to be sold to Getty. During those negotiations, the parties never discussed the issue of releases by Apex of any potential claims against the Lender Group as a component of the consideration that the Lender Group would receive for the release of its liens.

Less than two weeks after delivery of the Getty Letter of Intent, Apex defaulted on certain of its obligations under the Credit Agreement. Consequently, on June 17, 1987, the Lender Group published a notice of the foreclosure sale of the stock of Copper Mountain, Inc.

On June 25, 1987, as a condition to withdrawing publication of the foreclosed sale and reinstating funding under the Credit Agreement, and in consideration of the Lender Group's agreement to extend the Standstill Period, Apex agreed to pledge to the Lender Group on July 17, 1987 its equity interests in non-debtor affiliates. This was two days after the date on which, pursuant to the terms of the Getty Letter of Intent, a definitive purchase agreement between Getty and Clark was to executed and delivered. Apex and the Lender Group also agreed that the Standstill Period would immediately terminate on October 2, 1987 if the Getty transaction had failed to close and the Lender Group had not received $425 million in full satisfaction of the outstanding Pre-Petition Indebtedness by that date.

On July 8, 1987, the Copper Mountain foreclosure sale was cancelled. On July 16, 1987, the Lender Group agreed to extend the Standstill Period to October 31, 1987 to enable Getty and Apex to complete certain aspects of the transaction, such as the completion of title surveys, and to negotiate a final settlement of the DOE's claims. Serious efforts on the part of Getty, Apex and the Lender Group to negoti-

ate the final terms of a purchase agreement continued to mid-July, 1987. On or about July 17, 1987, however, the negotiations terminated.

Shortly after the Getty negotiations terminated, MCCP, Inc. ("MCCP"), a privately held entity created by a Chicago-based company controlled by Samuel Zell and Robert Lurie, entered into an agreement with Apex to buy the Clark assets. The terms of the MCCP proposal mirrored in large measure the terms of the aborted Getty transaction.

On July 21, 1987, the Lender Group agreed to extend the Standstill Period to November 30, 1987 to permit the MCCP transaction to close.

From September 1987 through November 1987, all interested parties made concerted efforts to meet the November 30, 1987 closing date under the MCCP agreement. Numerous meetings were held in Washington, St. Louis, and New York among Apex, the Lender Group and the DOE to negotiate a settlement of the DOE's claim which exceeded $300 million and which represented one of the largest obstacles in the path towards consummation of the transaction. The DOE discussions ultimately resulted in an oral agreement by the DOE to accept a $20 million settlement payable over time in satisfaction of its claim.

In the meantime, however, another significant development occurred that put consummation of the MCCP asset purchase in jeopardy. Product prices dropped, causing a reduction in the price that Apex would receive at closing for the sale of its Clark inventory.

As oil prices continued to fall in mid-October, 1987, concern grew among the Lender Group regarding Apex's ability to meet the shortfall created by the diminishing value of the Clark inventory. Additional asset sales (e.g., Copper Mountain) were suggested as means of filling the gap between the MCCP purchase price projected at closing and the $425 million the Lender Group agreed to accept in satisfaction of the outstanding indebtedness. Nonetheless, Messrs. Zell and Lurie became in-

creasingly reluctant for MCCP to purchase the Clark refineries, although they remained interested in the retail marketing assets (service stations). In late November, MCCP announced that it was no longer interested in acquiring the Clark refineries. This prompted a series of negotiations among representatives of MCCP, the Lender Group and Apex to modify the terms of the MCCP asset purchase. By this time, MCCP had invested approximately $3 million in "due diligence" investigations (i.e., professional fees and expense, title reports, surveys, etc.) concerning the asset purchase proposal.

The Horsham Corporation, first entered the picture after a Horsham board meeting on October 16, 1987. Mr. Novelly, then a member of the Horsham board of directors, described to Horsham the MCCP asset purchase agreement, MCCP's reluctance to acquire the Clark refineries and MCCP's wish to purchase only the service stations. Mr. Novelly asked the Horsham board if it was interested in purchasing the refineries in connection with the MCCP deal. Horsham was in fact interested.

Thereafter, Horsham spent approximately five weeks investigating the acquisition of the refineries. Horsham concluded that it would have great difficulty in financing a purchase of the refineries independent of the service stations.

Mr. Zell, meanwhile, continued his negotiations with the Lender Group through December 21, 1987. On or about December 19, 1987, the Lender Group accelerated its notes and commenced to foreclose on its collateral. Three days later, on December 24, 1987, Apex filed for Chapter 11 protection.

From early 1986 to the Filing Date, major domestic and international banks, investment banking firms, oil and gas producers, and prominent international investors knew of the Apex's financial problem and its willingness to sell the Clark assets or its ownership interests therein. They also knew of the general condition of the petroleum industry and the economic reversals that most independent refiners and marketers have experienced since the early

1980's. Given the extent of the Bear Stearns efforts to restructure Apex from early 1986 to the Filing Date and the responses of interested parties, the Clark assets were fairly and widely exposed to the world marketplace for an extended period of time.

The Lender Group fixed neither the level of discount on the face amount of their Notes nor the amount that they would accept in satisfaction their Indebtedness in connection with a sale of assets. Rather, price was always a function of the terms and conditions of the particular transaction being discussed and was arrived at through negotiations with the potential purchaser. The Lender Group never requested releases in any of these transactions, and the issue of releases never affected the price the Lender Group negotiated for in any of these transactions.

Immediately following the filing of their Chapter 11 petitions, Apex obtained a post-petition revolving credit facility in the approximate amount of $145 million from the Lender Group. Advances under that facility (the "Post–Petition Indebtedness") were secured by first and prior liens on all of Apex's assets, subject only to valid and enforceable liens existing on Apex's property as of the Filing Date. The Post–Petition Indebtedness is evidenced by certain promissory notes (the "Post–Petition Notes", the Pre–Petition Notes and Post–Petition Notes hereinafter being collectively referred to as the "Claim" or "Claims") executed and delivered by Apex to the Lender Group. Repayment of the post-petition indebtedness has been granted an administrative priority under Bankruptcy Code § 364(c)(1). This post-petition financing enabled Apex to continue its various business operations.

On January 14, 1988, MCCP made a proposal to the Lender Group that contemplated the purchase of Clark, Copper Mountain, COTC and/or an assignment of utility contracts, the Toledo, Rockford, Baltimore and Albany terminals, the Mt. Airy facilities and four tankers for a total purchase price of $280 million plus an amount equal to the fair market value of the Clark inventories at the time of closing. Of the $280 million purchase price, $200 million would be payable in cash, the balance to be covered by an $80 million note secured by the refineries and a supply contract. Principal and interest on the note would be paid from the net proceeds of sale of certain assets to be placed in a liquidating trust by Mr. Zell for the benefit of the Lender Group. A minority equity interest in MCCP was offered to Mr. Novelly. Mr. Zell also offered to purchase these assets subject to an amount not to exceed: 1) $15 million of encumbrances, and 2) $32 million in contingent liabilities. The Lender Group advised Mr. Zell that it did not own the assets and was therefore not in a position to sell the assets to him.

On January 29, 1988, MCCP offered to purchase the claims for $200 million in cash plus, at the option Lender Group:

 (i) $40 million in cash; or

 (ii) delivery of an $80 million note secured by the refineries and a supply contract; and

 (iii) inventory financing contribution of $5 million plus dedication of all purchased assets except service stations as collateral to lenders who provide inventory financing for refineries.

This proposal also contemplated the replacement of the Lender Group's Post–Petition Indebtedness.

A sale of the Claims was attractive to the Lender Group because, *inter alia*, it could be accomplished within the context of the Chapter 11 proceedings in a short period of time. The post-petition relationship between Apex and the Lender Group had been strained. Apex wanted MCCP to purchase the Lender Group's Claims, remove the Lender Group from the cases, and allow Mr. Zell to become Apex's new lender.

Horsham's interests in acquiring Clark renewed since Horsham had passed on MCCP's joint venture proposal back in the Fall of 1987. During January and February, 1988, while MCCP was negotiating with the Lender Group, Horsham structured its own proposal whereby Horsham would lead an acquisition with a minority equity partner. Horsham approached sev-

eral potential joint venturers in Europe and the United States but failed to interest them. During this time, Mr. Novelly remained a director of Horsham.

Negotiations between MCCP and the Lender Group concerning the terms and conditions of a purchase by MCCP of the Claims continued throughout February, March and April 1988. MCCP planned to purchase the Claims and use them as "currency" to purchase the Clark assets. At no time during this period did the Lender Group ever advise MCCP that they would require releases as a condition of any Claims sale. The negotiations between MCCP and the Lender Group for the purchase of the Claims never formally terminated.

In early April, 1988, Getty also expressed a renewed interest in purchasing the Clark assets. During March 1988, Getty retained the investment banking firm of Whitman, Heffernan, Rhein & Co., Inc. ("WHR") to assist it in an acquisition of the Clark assets. On April 5, 1988, WHR met with the Lender Group and delivered a term sheet dated April 4, 1988 outlining a proposal for the purchase by an undisclosed client of WHR (identified as "Newco") of substantially all of the assets of Clark, together with two terminals at Toledo, Ohio and Rockford, Illinois, for an aggregate purchase price of $300 million in cash plus an amount (estimated to be $150 million) equal to the fair market value for Clark inventories at closing. Out of the purchase price, $35 million would be put into escrow to cover any environmental clean-up costs; any balance remaining would be paid to Apex at the end of a ten-year period. This proposal did not contemplate the assumption of any contingent liabilities, such as the DOE claims.

The WHR term sheet also stated that, in the event the exclusive period was terminated prior to June 1, 1988, Newco would make a similar offer to any secured creditor, the Examiner or the Committee who proposed a plan of reorganization. Finally, the WHR term sheet provided for the payment of a bust-up fee, should the Bankruptcy Court approve a higher bid.

During the months of March and April, the Lender Group fully cooperated with WHR and Getty in their efforts to conduct a preliminary due diligence review of Apex's businesses and assets. Pursuant to executed confidentiality agreements between the Lender Group and each of Getty, WHR and Chemical Bank, the Lender Group provided Getty with asset valuation reports, analysis of claims against Apex, and various other materials prepared by the Lender Group's consultants.

WHR prepared a proposal dated April 26, 1988 pursuant to which, among other things, WHR and its investors or co-lenders would acquire the Claims for $395 million. Furthermore, pursuant to that proposal, as a condition to purchasing the Claims, WHR would obtain the Committee's agreement to pursue a creditors' plan of reorganization. The WHR proposal also contemplated that Getty would acquire the Clark assets for $310 million, $330 million, or $355 million if the sale was consummated within 9 months, 12 months or after 18 months, respectively.

At that time, WHR estimated the value of the non-Clark assets to be worth between $30 million and $50 million. WHR further opined that the full value of the non-Clark assets would have to be given to Apex and the unsecured creditors in order to induce them to agree to a creditors' plan of reorganization.

On May 5, 1988, Getty and WHR attended a meeting with the Committee in St. Louis. At that meeting, WHR presented to the Committee the April 4, 1988 term sheet. WHR and Getty told the Committee that Getty had a commitment for financing a purchase of the Clark Assets. In fact, Getty did not have such a commitment. WHR advised the Committee that Getty was aware that the Lender Group was only interested in a cash sale of the Lenders Groups' Claims. Getty advised the Committee that it intended to attempt to consummate such a transaction with the Lender Group.

On May 19, 1988, WHR, Getty and Chemical Bank met the Lender Group in New York. At the meeting, Getty made

the Lender Group an oral offer to purchase the Claims for $395 million, subject to financing by Chemical Bank.

On or about May 16, 1988, Horsham, AOC and Apex met in New York. During that meeting the parties reached agreement whereby Horsham, through its subsidiary AOC, would attempt to purchase the Lender Group's Claims. Horsham believed that committing and paying substantial monies to the Lender Group to obtain a right to purchase the Lender Group's Claims would stabilize Apex's situation and create an opportunity to purchase the Clark assets.

During this meeting Horsham emphasized that an essential precondition to Horsham proceeding was Mr. Novelly's agreement that Horsham, through AOC, would have control of the Clark assets if and when acquired. Mr. Novelly agreed to this precondition.

At the conclusion of this meeting, the parties called Mr. Zell to arrange a meeting. The parties recognized that Mr. Zell, by virtue of his excellent reputation and relationships with most of the banks comprising the Lender Group, was an important person to involve in any proposal. Mr. Zell agreed to meet them at which time Horsham informed Mr. Zell it was: 1) willing to purchase the Lender Group's Claims for $395 million, 2) willing to purchase MCCP's prior "due diligence" for $3 million, and 3) Horsham would allow MCCP to invest in Horsham (not AOC). Thereafter, on May 19, 1988, MCCP and Horsham entered into a letter agreement.

On May 20, 1988, at a meeting of the Lender Group in St. Louis, MCCP advised the Lender Group that MCCP was unable to satisfactorily finance a purchase of the Claims and that, consequently, Mr. Zell had brought in an equity partner. The identity of the equity partner was not disclosed to the Lender Group at the May 20 meeting, although the involvement of Messrs. Novelly and Goldstein was disclosed. Additionally, at the May 20 meeting, the Lender Group was provided with a term sheet outlining a proposal to purchase the Claims for $390 million. Included in the term sheet was a provision requiring the Lender Group to furnish "customary" representations and warranties. The term sheet specified a closing date of July 27, 1988 and required the Lender Group's verbal acceptance by the close of business on May 23, 1988. The term sheet identified the purchaser of the Claims as "Note Acquisition Corporation, assignee of MCCP."

On Monday, May 23, 1988, the Lender Group verbally communicated to MCCP its willingness to attempt to negotiate a note purchase agreement. The Lender Group's counter proposal included an increase in the purchase price of the Claims to $395 million; it did not contain a demand for releases. It was during the telephone conference call of the Lender Group on Monday, May 23 that the issue of releases was first discussed.

On May 24, 1988, AOC forwarded to the Lender Group the first draft of a proposed Note Purchase Agreement. The draft Note Purchase Agreement contemplated execution by May 31, 1988. It contained extensive representations and warranties by the Lender Group regarding the perfection, recordation, validity and enforceability of the notes and the liens securing the Claims. It also contained a provision permitting the buyer to resell the Lender Group's claims to the Lender Group in the event the Bankruptcy Court entered an order disallowing any part of the claims of the liens securing the claims. At that time, the buyer under the Note Purchase Agreement was identified to the Lender Group as AOC Acquisition Corporation ("AOC").

After reviewing the May 24 draft of the Note Purchase Agreement, the Lender Group communicated to MCCP (i) its unwillingness to give representations and warranties regarding the validity and enforceability of the Claims and the collateral therefore, and (ii) its unwillingness to give the buyer the option to resell to the Lender Group the Claims in the event that Apex initiated litigation affecting such Claims.

By letter dated May 27, 1988, the Lender Group suggested to AOC draft language to be included in a note purchase agreement concerning a Bankruptcy Court order al-

lowing the Lender Group's Claims, acknowledging the validity and priority of their liens and approving the waiver of any and all claims of Apex against the Lender Group. The Lender Group also advised them that they would require similar releases from Messrs. Novelly and Goldstein and all non-debtor insiders, affiliates and related entities. The purpose of the provision was to eliminate the resale option and the necessity of representations and warranties about the Claims and the liens, and to guarantee that the Lender Group would receive a net recovery of $395 million. This was the first time the condition of releases was ever requested by the Lender Group in connection with a sale of the Claims.

On May 24, 1988, Getty also made a written offer to purchase the Lender Group's Claims for $395 million in cash. The terms of the Getty offer were identical to the terms negotiated with MCCP, with certain significant exceptions. In addition to full representations and warranties from the Lender Group, Getty required the Lender Group to defend and indemnify Getty and Chemical Bank in the event any claims or causes of action were asserted by Apex or non-debtor affiliates or principals against the holder of the Claims. Although Getty's offer included a provision for the posting of a letter of credit for the purchase price, the closing was subject to all of the terms and conditions of a still-to-be drafted purchase agreement being satisfied. The Getty offer also contained a provision prohibiting the Lender Group from negotiating a sale of the Claims with any other party prior to closing.

By letter dated May 26, 1988, AOC advised Getty of an "agreement" between AOC and the Lender Group for the purchase of the Notes. AOC further advised Getty that pursuit by Getty of its offer to purchase the Lender Group's Claims constituted "tortious interference" with AOC's alleged "agreement".

On May 27, 1988, the Lender Group advised AOC that, although negotiations between the Lender Group and AOC were underway, there was no "agreement" between the parties. The Lender Group insisted that AOC "clear up the confusion" created by its letter of May 26, 1988 to Getty. The Lender Group continued to negotiate with Getty after May 27, 1988. Thus, for the next several weeks, the Lender Group negotiated on dual tracts with AOC and Getty.

On June 2, 1988, the Lender Group was advised for the first time by its counsel that Horsham Corporation ("Horsham"), a Canadian corporation, would be the indirect purchaser (through AOC) of the Lender Group's claims.

On June 6, 1988, for the Lender Group advised AOC that the Lender Group had agreed only to attempt to negotiate and document a note purchase agreement with an assignee of MCCP for the sale of the Claims at $395 million. The Lender Group further stated that, due to the disclosure that Horsham would be the purchaser, any agreement to negotiate a note purchase agreement had terminated. Finally, the Lender Group insisted that MCCP refrain from interfering with the Lender Group's consideration of a potentially advantageous commercial transaction with Getty.

Prior to execution of the Note Purchase Agreement, the Lender Group had indicated to a number of parties its willingness to sell the Lender Group's Claims at a discount. The discount on the Lender Group's Claims reflected in the Note Purchase Agreement was offered to Getty; the parties, however, were unable to agree on other mutually satisfactory terms and conditions, including the representations and warranties to be contained in any agreement to sell the Lender Group's Claims to Getty.

On the morning of June 8, 1988, the Lender Group met with Horsham, Apex and MCCP in Chicago to discuss, among other things, the roles of Horsham and Mr. Zell in the proposed purchase of the Lender Group's claims. At that meeting, Mr. Novelly advised the Lender Group that he supported consummation of a note purchase agreement between AOC and the Lender Group. Other than attendance at the June 8, 1988 meeting in Chicago, Mr. Novelly

had no involvement in the negotiation or formulation of the Note Purchase Agreement. At no time during the meeting on June 8, 1988 did the Lender Group discuss the issue of releases with any party.

The Lender Group also invited Getty to make a presentation on June 8, 1988. Getty informed the Lender Group at that time that it remained willing to purchase the Lender Group's Claims for $395 million in accordance with the terms of Getty's May 24, 1988 offer. The terms of the Getty offer were identical to the terms negotiated with MCCP, with two significant exceptions that pertained to the Lender Group. First, Getty continued to insist upon obtaining full representations and warranties from the Lender Group regarding the validity and enforceability of the Lender Group's Claims and the underlying liens securing these Claims. Second, the Lender Group would not receive the releases, and, thus, the Lender Group would remain liable after closing for any Apex claims, or claims of non-debtor affiliates or principals against the Lender Group. At the conclusion of the meetings with MCCP, Horsham, Apex and Getty, the Lender Group decided to continue the negotiation of a note purchase agreement with AOC, the newly-formed subsidiary of Horsham. The Lender Group believed it was more likely that a note purchase could be consummated with AOC as opposed to Getty because

 (i) AOC was more likely to obtain financing for the transaction,

 (ii) Getty had a history with Apex of changing terms and had backed out of a prior deal,

 (iii) AOC was prepared to put at risk substantial sums of money to obtain an option to purchase the Lender Group's claims, and

 (iv) due to Mr. Zell's relationship with Messrs. Novelly and Goldstein, AOC was more likely to obtain Apex's cooperation in closing the note purchase.

The Lender Group nevertheless recommended that Getty make a back-up offer for the purchase of the Notes. Getty never made such an offer.

Pursuant to the Note Purchase Agreement, the Lender Group and AOC agreed as follows:

 (a) AOC would purchase the Lender Group's Claims (as defined in the Note Purchase Agreement) on June 30, 1988 (the "Closing Date") for an aggregate purchase price of $396 million, subject to adjustment;

 (b) AOC agreed to pay the Lender Group $2,000,000 on or prior to June 28, 1988 (the "Effective Date");

 (c) The Lender Group agreed to grant AOC the option to extend the Closing Date to the date 60 days after the Effective Date by paying the Lender Group an Option Payment of $2,000,-000 on or before July 1, 1988;

 (d) The Lender Group agreed to grant AOC the option to extend the Closing Date for successive 30–day periods on up to 3 occasions by paying the Lender Group an additional Option Payment of $2,000,000 in consideration of each 30–day extension;

 (e) In the event of the exercise of its option to extend the Closing Date beyond 90 days from the Effective Date, AOC agreed to pay the Lender Group an amount equal to 1% in excess of the Prime Rate (as defined in the Note Purchase Agreement) on the sum of $395 million less any reductions in the Pre–Petition Indebtedness and Post–Petition Indebtedness;

 (f) The Lender Group agreed to grant AOC the option to elect that parties jointly seek entry of a Bankruptcy Court order either (i) approving the waiver of claims of Apex against the Lender Group (but reserving Apex's right to assert such claims by way of set-off or recoupment) (the "Alternative Order") or (ii) approving the waivers of claims of Apex against the Lender Group, acknowledging the validity and priority of the Lender Group liens and allowing the Lender Group's Claims (the "Allowance Order"); and

 (g) The Lender Group and AOC agreed that entry of (i) an order approving

the transfer of the claims and (ii) either the Allowance Order or, at AOC's option, the Alternative Order were conditions precedent to closing.

The price for the sale of the Lender Group's Claims agreed to between the Lender Group and AOC was not materially affected by releases, representations or warranties. Rather, the discount reflected the Lender Group's valuation of Apex's assets as compared to the treatment to be afforded their Claims in the Chapter 11 proceedings, including any assertions of lender liability. Although in the course of negotiations, Mr. Novelly often complained to the Lender Group that they have damaged Apex by "tens of millions of dollars", he nevertheless stated at the Hearing that Apex should release its claims against the Lender Group because:

(a) there is no way to compel the Lender Group, within any acceptable time frame, to release their liens on Apex assets short of paying them in full;

(b) prosecution of lender liability claims would be massive involving discovery from 12 different lending institutions, consultants, experts, present and from employees of Apex. Based upon his experience with other large litigation matters, Mr. Novelly believes legal fees alone would range between $3 and $8 million and it might take years before the issues were finally adjudicated;

(c) Apex would find it very difficult to operate in a Chapter 11 environment while they were warring with their debtor-in-possession lenders who control, or at the very least severely limit, Apex's activities through the budget process;

(d) the Lender Group has advised Apex that if the AOC transaction is not consummated, they intend to oppose any extensions of the exclusivity period and force the liquidation of the businesses; (see n. 7 p. 856, herein)

(e) although Mr. Novelly believes the potential recovery in a lender liability action is significant (even assuming Apex could survive long enough to prosecute such an action), it is impossible to predict or quantify an outcome. In short, the certainty of a transaction which relieves Apex of the Lender Groups' Claims is preferable to the uncertainties of vigorous and destructive litigation with the Lender Group. Nonetheless, whatever discussion there had been since the Filing Date about litigation against the Lender Group was between Apex counsel and counsel for the Lender Group, or in publicly filed documents.

Once AOC signed the Note Purchase Agreement with the Lender Group, it focused its efforts upon negotiations with Apex. No asset purchase agreement between Apex and AOC was in existence on June 28, 1988, the date of the Note Purchase Agreement. Furthermore, Horsham, AOC, Apex and its principals had no agreement, expressed or implied, about any asset purchase. In fact Mr. Novelly was thereafter excluded from Horsham's deliberations regarding its strategy and negotiations with Apex.

Additionally, the Lender Group did not participate in the negotiation of the proposed purchase by AOC of Apex's assets. At the time the Lender Group executed the Note Purchase Agreement, they did not have knowledge about AOC's intentions or how AOC might use the Lender Group's Claims. They did not know how or when AOC proposed to purchase Apex's assets or whether AOC proposed to purchase all or just some of those assets. Indeed, in early June the Lender Group met with the AOC and demanded that it disclose what it planned to do after it acquired the Lender Group's Claims. AOC refused to answer. In fact, AOC was not yet certain what its next step would be.

The Lender Group first learned of AOC's intention to purchase the assets of Apex and to use the Lender Group's Claims in connection therewith in August 1988.

During the initial phase of the Asset Purchase Agreement negotiations, Apex insisted that AOC's acquisition of Clark and other assets be consummated as part of a plan of reorganization. AOC rejected this demand, contending that the time limits on the Note Purchase Agreement with the Lender Group rendered the confirmation of

a plan of reorganization by November 25, 1988, highly unlikely, if not impossible.

By August 1988, Apex withdrew their insistence that the sale be part of a reorganization plan, and the parties began negotiations over which assets AOC would purchase and which assets would remain. During this phase of the negotiations, a coherent framework for the acquisition began to emerge: the assets to be left in the estates would comprise, at a minimum, those that had been the core of the "old" Apex Oil Company, i.e., the trading company that had been remarkably profitable during the late 1970's and early 1980's. Mr. Novelly became more heavily involved in this phase of the negotiations as Apex selected those assets required to make the trading company viable.

As the lists of assets to be sold and assets to remain began to emerge, the Committee also became more involved in the negotiations. The Committee's primary goal was to insure that the remaining assets would be able to generate sufficient revenues to make a plan of reorganization possible. Among other things, the Committee demanded and received the following concessions from AOC:

(a) AOC agreed to increase the cash portion of the purchase price from approximately $10 million to $22.5 million;

(b) AOC agreed to guarantee that the business retained by Apex would have at least $15 million in working capital after the sale;

(c) AOC agreed to provide accounting, management, personnel and other administrative services to Apex on a cost basis for at least one year following the closing;

(d) AOC agreed to enter into various agreements with Apex on a fair market basis for the leasing of assets, the sale of goods, and the providing of other services by Apex to AOC. The purpose of these agreements was to insure that Apex would have at least one major customer for its services and products during the transition period while Apex sought out new customers in an open market. With the Committee's approval, Apex and AOC executed the Asset Purchase Agreement on August 30, 1988. The Committees' approval was conditioned upon the requirement that "what was left behind had to work." In other words, the parties' approval was based upon there being no material adverse impact upon annual net revenues as set forth in Apex's projections.

In connection with the negotiation of the First Amendment at a meeting held on October 27, 1988, Messrs. Novelly and Goldstein agreed to place their personal releases into escrow to be delivered upon consummation of the Asset Purchase Agreement in exchange for those elements of the Purchase Consideration.

Since execution of the Asset Purchase Agreement, Apex has been in negotiation with AOC over various post-sale agreements between Apex and AOC. Apex and AOC have agreed upon term sheets concerning such operating agreements and they are reviewing drafts of contracts.

On September 1, 1988, Apex filed its Note Purchase Motion and its Acquisition Motion, requesting Court approval of both the Note Purchase Agreement and Asset Sale Agreement. Getty filed its objection on September 30, 1988. The October 31, 1988, Hearing precipitated the following conclusions of law.

DISCUSSION [8]

The Motions present unique opportunities for substantial benefit to the Apex estates. The contracts negotiated by AOC and envisioned by Getty would greatly facilitate an Apex reorganization. Likewise, the estates will be confronted with significant adverse consequences should both the Motions and the Getty proposal be denied. These alternatives are recognized by all parties. Indeed, because of the enormous value which is perceived to inure to the

---

**8.** To the extent any of the following conclusions of law shall also constitute, in whole or in part, findings of fact, then they shall be so construed.

Apex estates if the contemplated transfers are authorized by the Court, no party has objected to the transactions underlying the Motions and all parties to these proceedings support them.[9]

The Acquisition Motion is brought under Section 363(b) of the Bankruptcy Code.[10] The applicable portion of that section states:

> (b)(1) The Trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

■ Section 363(b)(1) mandates that the best interest of the estate be met by requiring any sale not in the ordinary course of business be: 1) for a fair and reasonable price, and 2) in good faith. *In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr.D. Del.1987), *In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr.E.D.Pa.1987), *In re Ancor Exploration Co.*, 30 B.R. 802, 808 (N.D.Okla.1983) and *In re J.M. Fields, Inc.*, 8 B.R. 638, 642 (Bankr.S.D.N.Y.1981). The Court is called upon to determine whether the AOC agreements (embodied in the Motions) satisfy the requirements of § 363(b). If they do, should they nevertheless be denied because 1) they unfairly locked out competing offers and 2) the Getty proposal confers greater benefit to the Apex estates?

## I. THE NOTE PURCHASE MOTION AND ITS RELEASE OR SET OFF PROVISIONS

The Note Purchase Motion essentially requests approval of the Note Purchase Agreement which contains the terms and conditions of the sale of the Lender Group Claim to AOC. Pursuant to the Note Purchase Agreement, the Lender Group has agreed to sell its Claim to AOC for a purchase price of $396 million cash.

In addition to approval of the transfer of the Lender Group Claim to AOC, the Note Purchase Motion and the Asset Sale Motion seek alternatively to obtain release of liability from the Apex estates or enforcement of the following provision contained in the Note Purchase Agreement:

> "any and all claims and rights, whether matured or unmatured, if any, relating to or arising from any action or conduct of the Agents or any of the Secured Banks, may be asserted by Debtors, and any other party in interest on the Debtors' behalf, only by way of setoff or recoupment against the Total Bank Claims."

Pursuant to Bankruptcy Rule 9019(a), this Court has the discretion to approve a compromise settlement such as the waiver of claims or releases requested in the Note Transfer Motion. Such "[c]ompromises are a 'normal part of the process of reorganization.'" *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130, 60 S.Ct. 1, 14, 84 L.Ed.2d 110 (1939)). The purpose of a compromise is to "allow the trustee and the creditor[s] to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." *United States v. Alaska Nat'l Bank (In re Walsh Constr., Inc.)* 669

---

9. None of the three objecting parties oppose the transfer of the Lender Group claim and sale of the Clark assets. Indeed, Getty's counsel stated at the hearing that given a proper evidentiary record, "... there's going to be a sale. The only question is to whom." New York Life seeks only clarification of its first priority lien position on certain service station properties and does not otherwise object to the Motions and Sun Oil requests that, among other alternatives, the Court impress the sale proceeds with a constructive trust for its benefit.

10. Numerous objections to the Motions were filed based upon the theory that granting the Motions would result in a sale of substantially all of the Apex assets which requires the approv-

al of a disclosure statement and the confirmation of a plan of reorganization, (See *Pension Benefit Guaranty Corp., Continental Air Lines, Inc., v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)* 700 F.2d 935 (5th Cir.1983) which held that a chapter 11 debtor may not reorganize the estate in some fundamental fashion through a sale of assets outside of the ordinary course of business under Section 363(b) without "scaling the hurdles erected in chapter 11"). All objections based upon the need for a confirmed Chapter 11 plan were conditionally withdrawn prior or during the hearing. The condition to withdrawal of the objections was that the Motions be approved.

F.2d 1325, 1328 (9th Cir.1982). *Accord, Martin v. Kane (In re A & C Properties )*, 784 F.2d 1377, 1381 (9th Cir.) *cert. denied,* 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986), ("[t]he law favors compromise and not litigation for its own sake").

The standard for compromise and approval of a settlement is whether the settlement is "fair and equitable" and "in the best interests of the estate." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. at 424, 88 S.Ct. at 1163. *See also TFC Banking & Sav. v. Leonard (In re Erickson ),* 82 B.R. 97, 99 (D.Minn.1987); *In re Bell & Beckwith,* 77 B.R. 606, 611–12 (Bankr.N.D.Ohio 1987).

■ This Court need not conclusively determine claims subject to compromise, nor find that the settlement constitutes the best result obtainable. *See Cosoff v. Rodman (In re W.T. Grant Co.),* 699 F.2d 599, 608, 613 (2d Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). Instead, this Court need only canvass the issues to determine that the settlement does not fall "below the lowest point in the range of reasonableness." *Id.* at 608. *See also Rivercity v. Herpel (In re Jackson Brewing Co.),* 624 F.2d 599, 604 (5th Cir. 1980) ("approval of a settlement does not depend on establishing as a matter of legal certainty that the subject claim ... is or is not worthless or valuable").

The Court should reach an "informed and independent" judgment as to whether the compromise is in the best interests of the estate. *Martin v. Kane,* 784 F.2d at 1382. However, the debtor-in-possession's judgment in recommending a settlement should not be substituted as long as the settlement is reasonable. *In re Grant Broadcasting, Inc.,* 71 B.R. 390, 399 (Bankr.E.D.Pa.1987). *See also Texas Extrusion Corp. v. Palmer, Palmer & Coffee (In re Texas Extrusion Corp.),* 68 B.R. 712, 720 (N.D.Tex.1986), *aff'd,* 836 F.2d 217 (5th Cir.1988). Likewise, the Court must given "a proper deference to (the creditors') reasonable views in the premises." *Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir.1929).

■ Finally, the factors that the Court should consider in assessing a compromise and settlement are set forth in *Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir.1929): "(a) [t]he probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *Accord, Martin v. Kane,* 784 F.2d at 1381; *In re Flight Transp. Corp. Sec. Litigation,* 730 F.2d 1128, 1135 (8th Cir.1984), *cert. denied,* 469 U.S. 1207, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985); *Rivercity v. Herpel (In re Jackson Brewing Co.),* 624 F.2d 599, 602 (5th Cir.1980).

It is axiomatic that the process of "[e]valuating the settlement value of a lawsuit is difficult business, particularly in the context of bankruptcy." *Texas Extrusion Corp. v. Palmer, Palmer & Coffee,* 68 B.R. at 719. Where, as here, the claims to be released are purely hypothetical and have not been asserted, the task of evaluating the appropriate consideration, if any, for the waiver of such claims is not scientific.

A trustee under Chapter 11 of the Bankruptcy Code is a fiduciary, responsible for managing the affairs of the debtor for the benefit of parties with an interest in the debtor's estate. *See, e.g., 5 Collier on Bankruptcy* ¶ 1106.01, at 1106–07 (15th ed. 1985). Section 1107(a) of the Bankruptcy Code, 11 U.S.C. 1107(a), grants debtors-in-possession the same authority and responsibilities as a trustee. The Committee owes the same duty of loyalty to its constituents. In the exercise of their fiduciary obligations, Apex and the Committee have investigated and analyzed the validity and enforceability of the Lender Group's Claim. In a comprehensive report the Committee has identified several legal theories that could be advanced to attack certain portions of the Lender Group's Claim. An exhaustive investigation and analysis by the Committee led it to conclude that, on balance, the benefit to be obtained by the Apex estates as a result of the proposed sale outweighed the value which litigation

would bring. To the extent that any of the assets of Apex were unencumbered by liens in favor of the Lender Group on the Filing Date, the Lender Group obtained through this Court's Financing Orders, first and prior liens on all of Apex's assets, subject only to valid and enforceable liens existing on the Filing Date, as security for the post-petition credit facility. Thus any attack on the Lender Group's asserted pre-filing lien position would have to overcome yet another barrier.

 The illusory benefits of an uncertain litigation outcome are eclipsed by the costs, delays and risks that Apex would face in the event they pursue litigation against the Lender Group. *See In re Baldwin–United Corp.*, 43 B.R. 888, 901–02 (Bankr.S.D.Ohio 1984). Attempts to construct the basis for a cause of action against the Lender Group through discovery would be costly and, perhaps, futile. Where, as here, litigation would be speculative, expensive and disruptive, settlement is in the best interests of the estate. *See In re Hanson Industries, Inc.*, 88 B.R. 942, 949–50 (Bankr.D.Minn. 1988) (approving settlement where lender liability lawsuit was based on undeveloped theories and sketchy facts and where discover costs would be exorbitant).

No claims or causes of action relating to the Lender Group's claims or to any conduct of or actions by the Lender Group have been asserted by Apex. Moreover, there is no basis for this Court to conclude that, absent the waiver, such claims or causes of action would be asserted by Apex in the future.

The Apex estates and the Committee have determined that any claims or causes of action relating to the conduct or actions of the Lender Group, if asserted, would be based on novel legal theories. In the considered legal and business judgment of Apex and the Committee, the speculative value of these unasserted claims is far exceeded by the tangible benefits afforded under the Asset Purchase Agreement. Under the circumstances, this Court shall not set aside the judgment of Apex in concluding that more value would inure to its estates by giving releases for value than in

litigating with the Lender Group. In the event the transaction with AOC is not consummated, the Lender Group has indicated its intention to seek to liquidate Apex's businesses. It is entirely possible that nothing will remain in these estates except a hypothetical claim which, if asserted, would be hotly contested. Under these circumstances, this Court cannot say that Apex's judgment is unreasonable.

Rather, the Court is inclined to agree with the recent observation of another bankruptcy court in this Circuit:

"This settlement ... offers some hope of minimal payment to the unsecured creditors; without it, they take a gamble on a piece of litigation which would likely drag on in the future and which could drain the estate of any assets it might otherwise have for distribution. Settling for less than one might like is often the best answer to resolve what has become 'a can of worms' ... [A] gamble on poor risks like this one is not in the best interests of the estate."

*In re Hanson Industries, Inc.*, 88 B.R. 942, 950 (Bankr.D.Minn.1988).

Apex has exercised its reasoned and informed judgment in recommending the releases that would enable AOC to acquire the Lender Group Claims at a discount, thereby facilitating consummation of the Asset Purchase Agreement and the development of a plan of reorganization. By providing the much needed cash to fund, in part, a plan of reorganization, the Asset Purchase Agreement significantly enhances Apex's chances of emerging from Chapter 11 as a going concern and the unsecured creditors' prospects for a recovery. These benefits constitute more than ample consideration for the waiver by the Debtors of unknown and unasserted claims of speculative value.

Based upon a review of the record including: the Committee's comprehensive analysis of a) the validity and enforceability of the Lender Group liens, b) its analysis and conclusions regarding the probability of successful avoidance of such liens, c) the absence of evidence by any party's effort to initiate lender liability litigation, and d)

the ample evidence of good faith and arms-length, fully disclosed negotiation between AOC and the Lender Group; the releases of the Apex estates running to the Lender Group is fair and equitable and in their best interests.

## II. THE ACQUISITION MOTION

### A. The Requirement For Consideration Under Section 363(b).

A review of the benefits resulting from performance under the Asset Purchase Agreement (see p. 8 herein) conclusively demonstrates that the Purchase Consideration offered by AOC to the Apex estates constitutes fair and reasonable value for the property sold. *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3rd Cir.1986), citing *In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1197 N. 1 (7th Cir.1978).

When the value of the Purchased Assets is measured against the benefits to Apex represented by the Purchase Consideration, the sale presents a lucrative business opportunity to the Apex estates and is based upon sound business justifications. Accordingly, approval of the Acquisition Motion is appropriate under Section 363(b) of the Bankruptcy Code, absent a showing of bad faith. *Stephens Industries, Inc. v. McClung, supra* 789, F.2d at 389–390.

Apex has articulated an array of compelling business reasons for the sale of the Asset Purchased Assets. It will not fully liquidate under the Purchase Agreement. Rather, it will preserve a core of vital assets around which it can effectively reorganize. In addition, AOC plans to continue the business operations of the Purchased Assets as viable companies, employing people and producing product with significant markets. *In re Rausch Mfg. Co., Inc.*, 59 B.R. 501 (Bankr.D.Minn.1985); *see also Coastal Industries, Inc. v. United States Internal Revenue Service (In re Coastal Industries, Inc.)*, 63 B.R. 361 (Bankr.N.D. Ohio 1986). Apex has established that the sale is in the best interest of the estates and the transaction is for a proper purpose under the Bankruptcy Code.

The Bankruptcy Code further requires that sales of property under Section 363(b) which are to be made free and clear of liens shall satisfy Section 363(f). This Court concludes that the Purchase Agreement satisfies all requirements of the Bankruptcy Code § 363(f) for the sale of property free and clear of liens, claims, taxes, encumbrances and interest. *Lindsey v. Ipock*, 732 F.2d 619, 622 (8th Cir.1984); *cert.* denied 469 U.S. 881, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984).

### B. The Requirement Of Good Faith Under Section 363(b).

■ Getty argues that the Asset Purchase Agreement does not satisfy the good faith requirements of Section 363(b) because it allegedly "allows insiders and fiduciaries of Apex wholly inequitable benefits at the expense of the unsecured creditors." The question to be decided here is whether, under the circumstances of the case, the transaction was made in good faith. The criteria to be considered when making an evaluation of good faith are almost universally stated as follows:

> "The requirement that a purchaser act in good faith ... speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchasers' good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1998 (7th Cir.1978).

*Accord In re Andy Frain Services, Inc.*, 798 F.2d 1113, 1125 (7th Cir.1986) (same); *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir.1985) (same). In short, "[l]ack of good faith is generally determined by fraudulent conduct during the sale proceedings." *In re Exennium, Inc.*, 715 F.2d 1401, 1404–05 (9th Cir.1983).

While Mr. Novelly will purchase a minority and non-controlling interest in AOC (*see* n. 6 p. 852), it is *not "per se* bad faith for [an insider] of the debtor to have an interest in the purchase of the debtor." *In re*

*Andy Frain Services, Inc.,* 798 F.2d 1113, 1125 (7th Cir.1986). On the contrary, it is well established that, even when the purchaser is an insider, "the Bankruptcy Court should have wide latitude in approving ... a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)" *In re Ancor Exploration Co.,* 30 Bankr. 802, 808 (N.D. Okla.1983).

Applying the standard, courts frequently have approved sales of assets to insiders. *See, e.g., In re Naron & Wagner, Chartered,* 88 B.R. 85, 88 (Bankr.D.Md.1988) (approved the sale of assets "to a corporation controlled by insiders of the seller, which is Debtor's subsidiary"); *In re Andy Frain Services, Inc., supra,* 798 F.2d at 1125 (7th Cir.1986) (affirmed sale of assets to insider of debtor, holding that "[e]ven if [the insider] were a fiduciary, a sale to him without more would not suffice to show a lack of good faith").[11]

The issue before the Court is not whether AOC is, or is affiliated with, an insider (*see* n. 6 p. 852). Nor is it whether an insider may benefit from the transaction. Rather, the issue is whether insiders of Apex breached their fiduciary duty to the estates and their creditors. Indeed, Getty conceded at the hearing that, "absent a violation of the fiduciary duty," there is "nothing wrong with 'an arms' length transaction [that] benefit[s] both the estates and an insider." At the hearing, Getty conceded that it had to "demonstrate to [the Court] that Mr. Novelly and Mr. Goldstein breached [their] fiduciary duty" to carry the burden of its objection.

The evidence presented at the hearing, did not establish the elements of a breach of fiduciary duty. Rather, it established and confirmed that the Asset Purchase Agreement was the product of vigorous, arms length, good faith negotiations among sophisticated parties. The Asset Purchase Agreement has evolved in a "fish bowl" under the watchful eyes of the Ex-

aminer and the Committee, with the involvement of all major interested parties. Based upon the evidence submitted at the hearing, the Court adopts the findings in the Examiner's Report concerning good faith. This conclusion is buttressed by following facts:

(a) Both Mr. Schulte and Mr. Delaney, President of AOC, who were involved in the negotiations, presented credible testimony that the negotiations between Mr. Novelly and Horsham/AOC were extremely hard fought. Mr. Schulte characterized the negotiations as "rang[ing] between normal business negotiations and civil war." Mr. Delaney testified that it was "a very hard, powerful negotiating process" and that his relationship with Mr. Novelly was "highly adversarial." The Examiner reported that Mr. Delaney further stated that he was not prepared "to commit personal resources and the net worth of my company plus financing requirements in excess of $300 million to a venture operated or controlled by Mr. Novelly." In his Report, the Examiner states that the consensus of all involved is that Mr. Novelly continues to negotiate hard to leave assets behind so that future operations of Apex will be feasible.

(b) The result of the negotiations is obviously a compromise in which neither party is completely satisfied. Mr. Novelly made substantial concessions concerning his relationship with AOC. Prior to the bankruptcy, Mr. Novelly had insisted that any entity acquiring the Clark assets include him as a "full partner" with substantial management prerogatives. In addition, Mr. Novelly sought a "carried interest" such that he would not have to pay for his interest in AOC. In the negotiations, AOC rejected both of those demands, and ultimately Mr. Novelly agreed that Horsham would control AOC and that Mr. Novelly "would put in cash contribution on the same basis as [Horsham]." Despite Getty's assertions to

---

**11.** *See also In re Kings Inn, Ltd.,* 37 B.R. 239, 243 (BAP. 9th Cir.1984) (the Court rejected argument that purchase of assets by insider constitutes lack of good faith, stating: "Appellant contends that the Bergendahl family's control of

various entities involved in this case and their knowledge and involvement in events which led up to this case preclude them from meeting the test of 'good faith'. The test of 'good faith' has not been interpreted as the appellant argues.").

the contrary, it is clear that the Shareholder Agreement as adopted incorporates both of those principles.[12]

(c) AOC made enormous concessions in the negotiations. Perhaps the most obvious example was AOC's agreement, made after the Asset Purchase Agreement was executed, to provide an additional $30 million in benefits to the Apex estates. Significantly, Mr. Novelly used his personal releases to extract this concession from AOC, yet the benefit of AOC's concession went to the Apex estate, not Mr. Novelly.[13]

The Court concludes from all of the evidence that there was no breach of fiduciary duty by insiders of Apex in the negotiation which led to the Asset Purchase Agreement. Accordingly, the Acquisition Motion was made and presented in good faith.

III. THE GETTY OFFER

A. Was Getty Locked Out Of The Bidding For The Note and Asset Acquisition?

 Getty's major objection to the Motions is that the Note Purchase Agreement results in AOC exclusively receiving the benefit of the discount offered by the Lender Group on its Claim. While the Lender Group Claim is $545 million, it is selling it for $396 million or a discount of approximately $150 million. Because this Court cannot compel the Lender Group to sell its Claim at discount to any other party, the only bid available to Getty is the full face amount of the claim, $545 million. Getty argues that this results in it being locked

out of acquiring the Claim and prohibits it from effectively bidding on the acquisition of Apex assets. Importantly, Getty charges its lock out (to the $150 million discount) is due to Mr. Novelly's alleged intervention on behalf of and his option to acquire stock ownership in AOC. It is by Mr. Novelly's purported influence on behalf of AOC in delivering Apex releases of liability and the resulting lock-out of Getty (to contract to acquire the Claim discount and Apex assets) which it asserts is a breach of Mr. Novelly's fiduciary duty to the Apex estate and its creditors.

Getty argues that the Court should use its equitable powers (because Apex breached its fiduciary duty and good faith requirement) to "unlock" the Note Purchase Agreement so as to permit it to pay the Lender Group $396 million and receive the $150 million discount. Getty would then bid a higher price for the sale of Apex assets, thereby delivering greater benefit to the creditors of the Apex estate.

For more than two years, both before and after Apex filed its Chapter 11 petition, Apex attempted to sell its Clark assets in order to obtain cash to pay its creditors. Apex hired Bear Stearns to find a suitable buyer, and through Bear Stearns' efforts a series of potential purchasers considered buying the Clark assets. Nevertheless, until the AOC Asset Purchase Agreement, each of the potential purchases—including a number of bids by Getty—fell through. (*See* pp. 855–66 herein.)

---

**12.** It is uncontested that Mr. Novelly is required to invest pro rata for his interest in AOC. Indeed, the terms of the Shareholder Agreement favor Horsham over Mr. Novelly because Horsham is entitled to purchase Mr. Novelly's shares at 90% of their value. Moreover, notwithstanding Getty's position, Horsham has control of the management of AOC. The 90% approval requirement applies only to extraordinary actions and does not materially affect the daily management of the corporation. Similarly, the provision that a quorum requires attendance by all members of the board merely ensures that minority board member will have an opportunity to be heard. It does not give minority members a veto power through refusal to attend meetings because it would be a violation of a director's duty to attend meetings.

**13.** Although it is always difficult to determine the reasons for an individual's conduct, the record offers insight into the reason that Mr. Novelly bargained so aggressively in behalf of the Apex estates was revealed by Mr. Delaney, the President of Horsham:

"He ... became convinced that ... Apex['s interests] were in fact, going to be his interests, and that he was going to be identified with that company, both in terms of financial success and ... more importantly with its perceptual and visual success and he began to work very hard to negotiate very hard with [AOC] to ensure that the particular business with which he was going to be identified was sufficiently well funded, that its success was assured."

Despite this record, Getty asserts that there was a breach of fiduciary duty. Each of the issues raised by Getty shall be discussed.

First, Getty makes much of the fact that if AOC benefits from this transaction Mr. Novelly will benefit too. But as Getty conceded at the outset of the hearing, absent a breach of fiduciary duty, it is perfectly proper after full disclosure and a hearing upon due notice for an insider to benefit from an asset purchase so long as the transaction is in the best interests of the estate. Thus, the mere fact without more that Mr. Novelly may benefit from this purchase is not grounds for finding a breach of fiduciary duty.

Second, Getty asserts that there must have been fraud or collusion because there is no other legitimate reason for Mr. Novelly's participation in this transaction. The record, however, shows otherwise. Mr. Delaney logically explained that Mr. Novelly brought the transaction to Horsham, and "[w]e wouldn't do a lot of deals if the people that introduced us, if we froze them out subsequently." Moreover, AOC does "need and ... want from Mr. Novelly his knowledge of a very complex set of assets and a very complex set of business relationships."

Third, Getty asserts that because AOC believes that it will benefit from the transaction, the transaction must be harmful to the Apex estates. Similarly, Getty contends that there must be something wrong with the AOC transaction because Getty's proposal will cost Getty more than AOC's bid will cost it. Those arguments are mistaken for three independent reasons.

(a) Getty's arguments confuse cost to the purchaser with benefit to the estate. It is the value of the benefit conferred on the estate, not the cost to the purchaser of providing that benefit, that is relevant.

(b) The evidence demonstrated that AOC's optimistic valuation (AOC values the Purchases Assets between $125 million and $150 million more than its $396 million offer to the Lender Group) of the assets was based on projected management improvements to be implemented by AOC in the future. There is no evidence that, without such improvements, the assets have such value.

(c) If the fact that the purchaser believes that it will profit by the purchase transaction is grounds for disallowing a sale, then few insider sales would be approved because only sales in which the purchaser thought it was making a bad deal would pass legal muster. As earlier indicated, insider sales are not *per se* illegal.

Fourth, Getty relies on a few documents in which it was suggested that a favorable bargain could be struck if AOC participated in a transaction with Mr. Novelly individually. Those comments are not binding with respect to Apex. Moreover, they were written well before this transaction was negotiated, and are contained in "selling documents" in which optimism and puffery is to be expected. Finally, and most important, whatever Horsham might have expected or hoped for before negotiations began, the evidence concerning the actual negotiations and their product all of which occurred after the documents were written, establishes that there was no collusion or breach of fiduciary duty herein.

Fifth, Getty asserts that it did not have a fair opportunity to bid for the Clark assets. Getty initially complained about certain of the bid procedures, such as the Bust–Up Fee. In closing argument, however, Getty abandoned such arguments. The evidence showed that the bid procedures were fair and reasonable. Getty's President conceded that Getty sought similar protections when it first bid for the Clark assets in 1987. Similarly, the evidence showed that it was reasonable for purposes of evaluating bids to give the Lender Group's Claims their full face value.

Lastly, Getty contends that it was unable to bid successfully for the Lender Group's Claim because it did not have Mr. Novelly's agreement to provide Apex releases, whereas AOC, through alleged collusion, did. The record, however, undermines that

assertion for the following independent reasons.

(a) As a threshold matter, Apex's releases are not Mr. Novelly's to provide. It is for this Court to decide whether the sale of assets and issuance of releases should be approved, and until this Court's ruling, no party could be certain that releases would be provided.

(b) Mr. Schulte, investment banker to Horsham, credibly testified that: "at the time of the Note Purchase Agreement ... AOC [had no assurances] that it would get releases from the Debtor and Novelly." [14] Rather, the totality of the evidence demonstrated that AOC agreed to provide Apex releases to the Lender Group when AOC did not have the release. AOC, therefore, took a substantial risk—the risk of losing the approximately $10 million that AOC invested in non-refundable option payments —that it would not be able to close the transaction and provide the releases.[15] Getty was unable to purchase the Lender Group Claims in part because it refused to take the same risk.

(c) The testimony that AOC had no assurances that it would be able to obtain the Apex releases when it executed the Note Purchase Agreement on June 28, 1988, is corroborated by the structure of the Note Purchase Agreement itself. The Note Purchase Agreement expressly provides that AOC can satisfy the Lender Group's condition that it receive a "net" payment in one of two possible ways, at AOC's election. *See* Note Purchase Agreement, § 4.1(c). First, AOC can deliver what is referred to as the "Allowance Order." This contemplates a release and discharge of all potential claims against the Lender Group. Alternatively, AOC can satisfy Section 4.1(c) by providing to the Lender Group an order of the Court that releases the Lender Group but reserves to Apex the right to recover and collect any lender liability claims by way of setoff or recoupment against the Lender Group's claims. Unlike the Allowance Order, this second order (as defined in the Note Purchase Agreement, the "Alternate Order") would not extinguish potential lender liability claims. Instead, recovery would be by way of offset against the Lender Group's Claims. The effect of the Alternate Order is merely to transfer the risk of potential claims from the Lender Group to AOC as the holder of the claims.

(d) The fact that AOC bargained for the right to satisfy the Lender Group with the Alternate Order indicates that on June 28, 1988, AOC had no assurances that it would be able to obtain by November 25, 1988 (i) Apex's agreement to release the lender liability claims as part of an asset purchase, (ii) the support of the Committee and other important creditor groups, and (iii) most importantly, the approval of this Court. The Alternate Order was AOC's escape hatch if it was not able to obtain releases from the Debtors.

(e) The record establishes that the Lender Group selected AOC's bid over Getty's bid for a number of reasons unrelated to Mr. Novelly: 1) Getty failed to consummate a 1987 contract to purchase the Clark assets because, in the words of one of its representatives, Getty "over negotiated" the deal, and 2) Mr. Hinrichs of the Lender Group testified that "because of a history of previous negotiations with Getty ... and Apex, [the Lender Group] did not have as high a confidence in the closing potential of a transaction with Getty" as with AOC. (*See* p. 863 herein). Under those circumstances, the Lender Group's decision to contract with AOC rather than Getty simply does not support Getty's assertion that collusion between Mr. Novelly and AOC

---

**14.** *Accord,* Tr. II at 32 (Delaney) (Q: "[A]re you telling us that you were prepared to commit to deliver releases to the bank group that you, in fact, didn't have committed to you? A: That is what we did."); Tr. II at 208 (Hinrichs).

**15.** Even reading the record most favorably to Getty, it is clear that if there were any agreement to provide releases, it was contingent upon the parties arriving at a satisfactory future agreement for the purchase of the Clark Assets and Court approval. At the time of the Note Purchase Agreement, there was no agreement concerning the sale of the assets or whether the Lender Group's Claims would ever be utilized in connection with a sale of the assets.

impaired Getty's ability to purchase the Lender Group's notes.

(f) Even assuming, for argument, that Getty had been asked by the Lender Group to provide a "net" payment, there are various ways in which Getty could have done so without cooperation from Mr. Novelly. For example, Getty could have proposed to the Lender Group the concept of the Alternate Order, as AOC did. Getty also could have offered to indemnify the Lender Group from lender liability claims.[16] Neither of these options would require the cooperation of Mr. Novelly. Instead, Getty insisted that the Lender Group provide Getty with certain indemnities, representations, and warranties.

In summary, to the extent the playing field is uneven because of AOC's rights to the $150 million discount under the Note Purchase Agreement, the Court is satisfied that it is not the result of any breach of a fiduciary duty by Mr. Novelly. Rather, it is the direct result of AOC's willingness to take on substantial financial risks,[17] its ability to develop creative solutions to the Lender Group's requirements for a "net" payment, and its greater credibility in the eyes of the Lender Group.

The purchase price for the Lender Group's Claims was negotiated in good faith by AOC and the Lender Group. The Lender Group's Claims were widely marketed over an extended period of time and were available for purchase by any party upon terms and conditions acceptable to the Lender Group.

Based upon a thorough review of the evidence and record, including the conduct and actions of all of the parties (including the Apex insiders) in negotiating the terms and conditions of the Asset Purchase Agreement and the Purchase Consideration, this Court concludes that the Acquisition Motion represents the product of arms-length, fully disclosed and good faith bargaining.

**B. Does the Getty Proposal confer greater benefit to those Apex estates?**

Because the Court declines to grant Getty the benefit of the Lender Group discount of $150 million, it follows that the Getty bid, which offers only up to $85 million (more than the AOC contract) in cash to the Apex estates does not confer greater benefit to the Apex estates.

CONCLUSION

The evidence supports the entry of an Order granting both Motions. Apex has demonstrated that taken as a unit the Motions satisfy the adequate consideration and good faith requirements of Section 363(b). On the other hand, the record fails to support Getty's allegations of bad faith dealings and breach of fiduciary duty to the Apex estates. After an open and complete disclosure of the negotiations leading to the presentation of the Motions, thorough investigation, and report of the parties conduct, an examination and analysis of the consequences of alternatives available (including the Getty proposal) and the full participation of all segments of creditors in these cases, the Court is persuaded by the unanimous voice of the creditor body which supports the Motions. It is their interests which are affected by the transactions at issue. Based upon the evidence adduced at the three day hearing, the Court finds that the Agreements presented in the Motions were entered into in good faith after arms-length negotiation and not in breach of any of the duties of Apex to its creditors and, that they will result in benefits to the estates and permit them a unique opportunity for reorganization. A separate Order consistent with this Opinion will be entered this day.

**16.** By May, 1988, Getty's investment banker had concluded that Apexs' claims against the Lender Group were not a serious matter. Rhein Dep. at 105–06.

**17.** In addition to the $10 million AOC has paid the Lender Group in non-refundable option pay- ment, it has also paid $3 million to acquire title work and other "due diligence" for the Purchased Assets and "several million" for professional fees. AOC estimates its costs will exceed $20 million by closing.